[No. 2159.   Decided May 29, 1896.]

THE STATE OF WASHINGTON, *Respondent,* v. CHARLES McGONIGLE, *Appellant.*

CRIMINAL LAW — INDORSEMENT OF WITNESSES ON INFORMATION — HOMICIDE — SELF-DEFENSE — EVIDENCE — KILLING OTHER THAN PERSON INTENDED.

The technical omission to indorse names of witnesses on an information is not ground for reversal where they were written in the body of the information.

Evidence of deliberation and premeditation on the question of murder in the first degree sufficient to go to the jury is given by testimony that the accused, after some trouble with a person, went to a

barn several hundred feet away, armed himself, and returning deliberately fired upon such person or a man mistaken for him.

Evidence of threats against an accused person by one whom he assaulted is inadmissible where it is clear that the threats could have had no possible effect on his mind, so far as creating a fear of the other person is concerned, and that his assault was not made in self-defense.

One who kills a person by mistake or misadventure, while attempting with deliberate and premeditated malice to kill another, is guilty of murder in the first degree.

Remarks of counsel cannot be reviewed on appeal, though set forth in an affidavit included in the statement of facts, when the certificate of the court to the statement does not attempt to certify that the things alleged in the affidavit occurred at the trial.

Appeal from Superior Court, Yakima County.— Hon. CARROLL B. GRAVES, Judge.     Affirmed.

*Mackinnon & Murane*, and *Jones & Newman*, for appellant.

*Ira P. Englehart*, Prosecuting Attorney, *H. J. Snively*, and *W. C. Jones*, Attorney General, for The State.

The opinion of the court was delivered by

DUNBAR, J.—The record in this case shows that on the 11th of August, 1895, in Yakima county, Washington, one J. M. Eaves, accompanied by his wife and daughter, went to the residence of Byron McGonigle, the father of the appellant in this case. The appellant at that time made his home with his father. The avowed object of the visit was to demand some explanation from the appellant McGonigle for certain slanderous stories which he was charged with having circulated concerning the daughters of the said Eaves. According to the undisputed testimony, upon arriving at the McGonigle residence about dusk, Eaves called to the appellant, who was a short distance away, saying, "Is that you, Charlie?"  Here the testimony varies, Eaves

and his wife and daughter testifying that Eaves said to the appellant that he wanted to talk to him about these alleged stories and that no hostile demonstration was made on the part of Eaves, but that McGonigle immediately retreated to the barn several hundred feet away,— that the Eaves family proceeded to the house,— the conversation above related having occurred at the gate,— that Mrs. and Miss Eaves were asked into the house by Mrs. McGonigle and her daughter Ida, and that they went in in obedience to such invitation; that at this juncture Byron McGonigle, the father of the appellant, met Mr. Eaves and that they stopped on the porch to talk over the matter in a friendly manner; that while they were talking, the appellant came running from the barn towards the house, and when within a short distance of them, said, " What are you doing there?   Get out ! " and at that moment fired a gun, the ball taking effect in Byron McGonigle, who immediately fell, and in a short time expired.   Eaves then ran into the house and requested his wife and daughter to blow out the light; upon their not complying readily, he blew it out himself, and almost immediately his daughter Beulah was accosted by the appellant, who said, " What are you doing there? "   At the same time he raised his gun and fired; the daughter jumped out of the way, and the father Eaves received the shot.   Upon this Eaves immediately drew a revolver and returned the shot, but the ball did not take effect.   Eaves testified that when the elder McGonigle was shot, he exclaimed, " My God, Charlie, you have killed me! " while Mrs. McGonigle and Ida both testify that the exclamation was, " Eaves has shot me."   The appellant himself testified that when Eaves called to him at the gate, he (Eaves) made threatening advances towards him, drew his re-

volver upon him, and told him that if he moved, he would blow his brains out; that he (appellant) immediately ran to the barn and armed himself with a Remington rifle and a revolver which he kept in the barn, and returned to the house; that when he got within a short distance he thought he saw Eaves drawing a revolver and fired, and that he afterwards fired the second shot at Eaves.    He was not at all certain whether it was the ball from his gun that had killed his father, or whether his father was fired upon by Eaves.    There were several disinterested witnesses, however, who testified that the appellant, who immediately left, related to them the circumstances of the shooting and told them that he was afraid he had killed his father through mistake.    This is in substance the testimony in the case.

The jury found the appellant guilty of murder in the second degree and from the judgment the case is appealed here.

The first error alleged is that the court erred in overruling appellant's motion to quash the information for failure to endorse thereon the names of the witnesses.    This court has often held that the only object of the requirement of the statute in relation to endorsing the names of witnesses on the back of the indictment was to give notice to the defendant of the witnesses who were to testify against him.    In this case the names of the witnesses were written in the body of the information, and it would be impossible for the defendant to read the information without being notified who the witnesses were.    Therefore the defendant was in no way prejudiced by the technical omission to endorse the names of the witnesses.

The second contention is that the motion of defendant to withdraw from the jury the question of murder

in the first degree at the close of the state's main case should have been granted inasmuch as there was no evidence whatever of premeditation or deliberation. Inasmuch as the undisputed testimony was to the effect that the appellant left the yard after having had some trouble with Eaves, went to the barn several hundred feet away, armed himself, returned to the house, and deliberately fired upon Eaves, or upon the man whom he supposed to be Eaves, we are unable to say that there was not sufficient evidence of deliberation and premeditation to go to the jury.

The third contention that the testimony of Mrs. Eaves and Beulah Eaves was incompetent is equally without merit. It was simply a relation of what took place at the time of the shooting. The same may be said with relation to the objection to the testimony of Dr. Hill. The discretion of the trial court was not abused in directing the course of examination. There seems to be no substantial merit to any of the objections raised by the appellant to the admission or refusal of testimony. There is one objection, however, which we think should be noticed. It is in relation to an attempt to introduce evidence showing that one Dickerson had told the defendant of threats made against him by Eaves. The court ruled that the threats of Eaves must first be shown to have been made by him. It is claimed by the appellant that this ruling is in opposition to the rule announced by this court in *State v. Coella*, 3 Wash. 99 (28 Pac. 28). In that case the defendant Coella, who was charged with having killed Deletis, was asked if any person had ever communicated certain threats that Deletis had made to him, and upon objection the defendant's attorney offered to prove by him that one Grossa had told the defendant that Deletis had said, "If Coella keeps on

talking about my owing him money I will kill him."
This court in commenting on that case, said:

"This testimony should have been admitted. It
was a circumstance to be considered in connection
with the attack which he claimed was made upon him
by the deceased, not as any evidence of the attack, but
as likely to have had some effect upon and tending to
show the condition of his mind when attacked as to
the danger he was in, or believed himself to be
in. For this purpose it was not subject to the rule
excluding hearsay testimony, and it made no dif-
ference whether deceased had, in fact, told Grossa
anything of the kind or not—the important thing
was whether Grossa had so told the defendant."

The testimony offered in this case we think can be
distinguished from the testimony offered in the case
above referred to, for here it was not even attempted
to be shown that Eaves had made these threats to
Dickerson, but it was one step further removed, viz.,
it was a rumor which Dickerson had heard which was
attempted to be given in evidence. But even if the
testimony could not be distinguished, it has no appli-
cation, we think, to this kind of a case, for there is no
contention in this case, even on the part of the appel-
lant, that he was acting in self-defense, and according
to his own testimony this rumor which had been com-
municated to him could have had no possible effect on
his mind so far as creating a fear of any action of
Eaves is concerned, for he testifies that Eaves had vio-
lently threatened him at the gate, had drawn his
revolver upon him and threatened to blow his brains
out, and that he had to retreat hastily, and ran in a
zig-zag manner to prevent the expected shot from
Eaves' revolver from doing him harm; and if this tes-
timony is true, and the appellant is bound by it so far
as this question is involved, it could have made very

little difference to him whether any prior threat had been indulged in by Eaves or not. Under the supposition that Eaves would do him great injury, according to his testimony, he retreated to the barn, but he did not see fit to act upon this fear, but, arming himself, he returned to the place where Eaves was, to renew the discussion. There is no pretense on his part that he was in any danger from Eaves after he had reached the barn or that he would have been in any danger if he had remained there, but his testimony was that he returned thus armed because he was fearful lest Eaves would do some injury to his family. There having been no testimony offered to the effect that these threats, which it is alleged Eaves had made, reached beyond appellant himself and to his family, we are at a loss to understand, under the circumstances as testified to by the appellant himself, how he could in any way have been prejudiced by the refusal of the court to admit this testimony.

The quotation from Wharton's Criminal Law (7th ed.), vol. 2, § 1023, cited by the respondent, is very apt.

"Necessity ceases to exist when the defendant though originally in imminent danger escapes; arms himself with a dangerous weapon, returns and slays his antagonist. The plea of self-defense rests on the natural right every man has to protect his own life against an unlawful assault upon it by another. If, however, when secure from danger by his actual removal from a threatened assault, he voluntarily returns to meet his adversary and renews the combat, it cannot be pretended that he acts in defense of his own life against impending and inevitable destruction; he assumes under such circumstances a new character. He becomes a party voluntarily entering into an unlawful conflict and is responsible for all the consequences following his new position."

The same logic applies to the offer to prove that

Woolsey had told McGonigle that Eaves was a bad and dangerous man.

The following instructions to the court are alleged as error:

"You are also instructed, that when a person purposely and of his deliberate and premeditated malice attempts to kill one person and in shooting at such person, a bystander or other innocent person is killed by the ball from the pistol of the person shooting such person, it is murder in the first degree.

I also instruct you, where a person purposely, and of his deliberate and premeditated malice attempts to kill one person, but by mistake or misadventure kills another instead, the law transfers the felonious intent from the object of his assault and the homicide so committed is murder in the first degree."

We think, under the overwhelming weight of authority, that this instruction was correct.

It is true that in *Bratton v. State*, 29 Tenn. 103, the rule was laid down under the statutes of Tennessee that if the defendant, intending to kill the prosecutor, where the killing would have been murder in the first degree, killed the wife of the prosecutor, the offense would not be murder in the first degree. The particular statute does not clearly appear from the opinion, but the editor of the report in a note to the same, comments upon this decision in the following manner:

"This decision leads to the curious anomaly under our statute, that although murder committed in an attempt to perpetrate larceny is murder in the first degree, yet the murder of one person, in an attempt to commit murder in the first degree on another, is not murder in the first degree."

The only other three cases cited by the appellant to sustain his contention are Texas cases — one from the state reports and two from the Texas appeals. These

cases are based upon the statutes, but while we are not satisfied with the reasoning of the case of the law announced, yet even there the courts held that though it was error to instruct that the unintentional killing of one man without malice done in the attempt to kill another with express malice aforethought, is murder in the first degree, yet if the accused was found guilty of murder in the second degree, the error was not in his prejudice; so that the conclusion reached by the Texas court could not be in favor of the appellant's contention.

The rule is thus laid down by 1 Bishop, Criminal Law (8th ed.), § 328.

"If one, with the intent to kill a particular individual, shoots or strikes at him, and by accident the charge or blow takes effect on another whom it deprives of life, . . . the party unintentionally causing the death is guilty, the same as if he had meant it, of the felonious homicide."

The same rule applies to arson, robbery, and nearly all other crimes the perpetration of which is *malum in se.*

The instruction of the court almost literally followed the rule announced by § 99 of Kerr on the Law of Homicide, which is as follows:

"Where a person with malice aforethought attempts to kill one person, but by mistake or misadventure kills another instead, the law transfers the felonious intent to the object of his assault, and the homicide so committed is murder."

See, also, Wharton, Criminal Law (9th ed.), § 382; Archbold, Criminal Practice, § 29.

We have carefully examined all the instructions given by the court and those asked for by the defendant, and we are satisfied that the instructions given fairly express the law governing the case, that they

were not in any way prejudicial to the defendant's interests, and that all the special instructions which were asked for by the defendant had either in substance been given by the court, or were not applicable to the case.

As to the objection raised by the appellant to the remarks alleged to have been made by the counsel of the prosecuting witness in his closing argument to the jury, this court is unable to determine from the record that such remarks were made. It is true there is an affidavit on file to that effect, and this affidavit is made a part of the statement of facts, but the certificate of the court of the statement of facts shows nothing more than that the affidavit was made; it does not attempt to settle the truthfulness or untruthfulness of the matters set forth in the affidavit. There is no certificate by the court that the things alleged in the affidavit occurred at the trial, and this court cannot, therefore, take notice of that which does not appear of record duly certified.

The objection that the evidence will not sustain the verdict cannot be sustained. The testimony was exceedingly conflicting. It was the province of the jury to weigh the evidence and to determine the credibility of the witnesses on questions of fact which were properly submitted to them. They have determined the issues against the appellant, and as no error of law was committed, the judgment must be affirmed.

Hoyt, C. J., and Scott, Anders and Gordon, JJ., concur.