[Crim. No. 883.  In Bank.—December 8, 1902.]

## THE PEOPLE, Respondent, *v.* JOHN FITZGERALD, Appellant.

CRIMINAL LAW—HOMICIDE—APPEAL—REVIEW—SUPPORT OF VERDICT.— The appellate jurisdiction of this court in criminal cases is limited to a review upon questions of law alone, and where there is some evidence tending to support a verdict of guilty upon a prosecution for murder, there can be no question of law as to the sufficiency of the evidence to support the verdict.

ID.—EVIDENCE—IMPEACHMENT OF DEFENDANT—FORMER TESTIMONY.— The district attorney, on cross-examination of the defendant, may by way of impeachment read questions asked of him upon a former trial from a transcript of his testimony taken at such trial,

and inquire whether at the former trial—giving the time and place when and where it occurred—he had testified so and so, putting the question.

ID.—NEW TRIAL—MISCONDUCT OF JUROR—COUNTER-AFFIDAVITS.—Upon review of the facts appearing in counter-affidavits, showing the incorrectness of a charge made in the defendant's affidavit on motion for a new trial, that the juror had visited the county jail without permission of the court, in reference to points contained in the testimony in regard to the treatment of the defendant in the jail,—held that a case of misconduct of the juror was not made out.

ID. — CIRCUMSTANCES OF HOMICIDE — CONTRADICTION OF DEFENDANT'S TESTIMONY.—In order to contradict the testimony of the defendant as to the circumstances attending the homicide in the room where it occurred in support of his claim of self-defense, it may be shown by witnesses who had become familiar with the scene of the homicide, that the angle defined in the room by the course of the bullet which killed the deceased, was different from that claimed by the defendant; and it may be shown by experienced witnesses that the effect of the firing of gunshot into woolen fabrics similar to the clothing worn by the deceased, at the near distance testified to by defendant, would be different from what appeared to be the fact with the deceased.

ID.—POSSESSION OF PISTOL—THREATS.—Under the circumstances in proof, the court did not err in admitting evidence to show that some time prior to the homicide, the defendant was in possession of a pistol, and that he had made threats against the deceased.

ID.—INSTRUCTION—DISTRUST OF WITNESS.—It was not error to instruct the jury that if any witness examined before them, or whose testimony taken elsewhere had been read to them, had willfully sworn falsely as to any matter, it is their duty to distrust the entire evidence of such witness.

ID.—REFUSAL OF INSTRUCTIONS OTHERWISE GIVEN.—It is not error to refuse to give instructions upon propositions of law which were substantially embodied in other instructions fully given to the jury on the same subject.

APPEAL from a judgment of the Superior Court of San Mateo County and from an order denying a new trial. W. P. Lawlor, Judge presiding.

The facts are stated in the opinion of the court.

Louis P. Boardman, for Appellant.

Tirey L. Ford, Attorney-General, for Respondent.

VAN DYKE, J.—The defendant was tried upon an information charging him with murder, in the killing of one John Lennon. He was convicted of murder in the second degree, and appeals from the judgment entered on the verdict, and also from the order denying him a new trial.

Up to the time that the cause was called on the calendar no briefs or points had been filed. Counsel other than the one who represented the defendant on the trial in the court below appeared and argued the case orally. Some two months or more after the cause was submitted, the attorney who represented the defendant on the trial made application for permission to submit a brief in his behalf. In order that the defendant might not be prejudiced by any misunderstanding or possible neglect on the part of his counsel in not having filed any brief or points and authorities within the time required by the rules of the court, permission was given to file a brief in his behalf. On the oral argument it was claimed that "the evidence does not sustain the verdict of the jury," and counsel in support of this contention reviewed at length the evidence introduced at the trial, which was quite voluminous. It appears, however, from such argument, as well as from an examination of the testimony in the transcript, that there is a substantial conflict; at any rate, that there is some evidence tending to support the verdict. By the constitution, appellate jurisdiction is conferred upon this court in "criminal cases prosecuted by indictment or information in a court of record on questions of law alone." Where there is evidence, therefore, to sustain the verdict, a question of law cannot arise, but only in a case where there is in effect an entire lack of evidence.

There was no question at the trial in reference to the homicide, but it was contended on the part of the defendant that the killing was excusable and justifiable, as being in self-defense.

On the oral argument, as well as in the brief, complaint is made that the court allowed the district attorney, on cross-examination of the defendant, to ask questions as to what he had testified on the former trial (this being the second trial), reading said questions from a transcript of his testimony taken at such trial. These questions were asked by way of impeachment, and it appears that the district attorney laid

the proper foundation by the inquiry whether, at the former trial—giving the time and place when and where it occurred—he had testified so and so, putting the question. There was nothing unusual in this proceeding; in fact, it is one of the common modes of impeachment. (Code Civ. Proc., sec. 2052.)

It is also claimed in the oral argument and in the brief that the court should have granted the motion for a new trial on the ground of misconduct of one of the jurors. At the hearing on the motion, an affidavit of defendant was submitted, in which it was stated that testimony was introduced in reference to the manner in which he had been incarcerated in the county jail at San Mateo upon the charge, pending his trial, and that during said trial Horace Nelson, one of the jurors, without the knowledge of the court, had visited the county jail and made a personal inspection and observation thereof with reference to the points contained in the testimony in regard to his said treatment. In the counter-affidavit of Nelson he states that, in company with two other persons and the jailer, he visited the jail, but denies that he made any personal inspection or observation thereof with reference to any evidence contained in the testimony of any witness concerning the treatment of the defendant, or of any other person confined in the jail, and states that his visit there was made simply out of curiosity, and that he did not talk with the defendant, or with any other prisoner or person, concerning the evidence introduced at the trial. The affidavit of J. C. Stuart states that he was with Nelson at the time and occasion mentioned in his affidavit, and that Nelson did not talk with affiant or with any other person, while in said jail, about said cause or about said defendant, or about said jail premises, or in reference to any testimony introduced at the trial; that affiant was invited to make said visit by one Professor Reynolds, who also invited said Nelson, and that nothing was said by either of the parties about said defendant or about the case. We do not think that a case of misconduct was made out against the juror in question.

Counsel in his brief contends that it was error in the court to admit the testimony of witnesses Gilbert and Mansfield as to the angle defined by the course of the bullet which killed the deceased; and further, that the court erred in admitting the testimony of witnesses Mansfield and Littlejohn concerning

the firing of gunshots into woolen fabrics, as the same had no bearing as to the manner in which the deceased met his death.

In order to understand the relevancy of this testimony, it may be necessary to refer to the circumstances relating to the homicide. It appears that the defendant and the deceased were stopping at the house occupied by the deceased, near the Holy Cross Cemetery in the northern part of San Mateo County, and it is claimed by the defendant that their relations up to the day of the homicide were friendly; that they both were in the habit of drinking quite heavily, and frequently joked and bantered each other, indulging in slang and vulgar language, but at the same time not in an unfriendly spirit. According to the testimony of the defendant, they got into a quarrel about some trifling matter on the night of the homicide, and he testified that the deceased knocked him down and beat him. He says: "I was pretty stupid, half insensible, and he quit, and was not holding me any more, and as soon as I recovered myself a little I reached for my hat, which was in front of me. I was pretty well under the table then. I had crawled there for safety. When I reached my hat I got farther away, and I crawled under the table, and I got up on the other side of the table and was getting around, and went around on my hands and knees part of the way on the other side of the table; and when I got up he was standing where I described that sideboard, and he was still talking in a threatening manner and said, 'That is not half that you will get, you son of a bitch,' and so on like that; and when I got around to the end of the table by the desk, going for the door, he rushed towards me again from the end of the table where the little lounge was, and where the sideboard was, and I saw him running for me again, and I grabbed for the rifle—it was near the window on my right, and I was about at the door at that time—and I struck him with the rifle. I think I knocked him back a little, and I struck him again. I was not able to strike hard, because this arm was nearly dead, the left arm, but I know I struck him a couple of times with the rifle. I did not knock him down, and he was in a stooping position reaching for it from the lounge, as if he was trying to reach to come after me, and he grabbed the rifle and I pulled away back to the door. The rifle went off. I slammed the rifle on the floor

and ran off up to the McMahon House.'' The killing occurred in the kitchen, and there was no one present at the time, and we only have the defendant's story as to the manner in which it occurred. The testimony complained of was for the purpose of showing by circumstantial evidence that the account of the tragedy as given by the defendant was not correct. For this purpose, the witness Gilbert, who was the county surveyor of San Mateo County, prepared a diagram of the rooms in the house in question, showing the position of the different articles of furniture therein at the time, which diagram was used at the trial. He also took measurements as to the height from the floor of the bullet-holes and marks made through the walls of the building and on the furniture, and in that connection gave the angles of the course of the bullet. It not being feasible to produce the building with its rooms before the jury on the trial, the next best thing was correct diagrams and accurate measurements for the purpose of illustrating the testimony. The witness Mansfield was the sheriff of the county, and he went to the premises with the Constable Neville the morning after the killing. He made an examination of the dining-room and kitchen and room occupied by the defendant, Fitzgerald. He says: ''I entered the dining-room and went into the small room known as the kitchen. In the kitchen of the house I found the body of John Lennon, lying with his head to the northwest corner and his feet projecting out towards the door leading from the kitchen to the dining-room. There were no powder-burns or marks upon him at that time.'' He says further: ''As a result of the examination I found a hole through the sofa, back of the sofa through the partition into the kitchen, struck the edge of the table and glanced off and passed off through a rear partition here [referring to said diagram in evidence]. It had made an indentation in the outer wall.'' He proceeds then to give the location of the different pieces of furniture found in the dining-room and kitchen at the time. Mansfield, it appears, was in the civil war, and testified that he was well acquainted with the use of firearms, and he and the witness Littlejohn experimented concerning the firing of gunshot into woolen fabrics similar to the clothing worn by the deceased, as to the effect of powder-marks on the same, with both the use of smokeless powder and black powder, and it appeared as the result that at the

distance of one foot eighteen inches, and even two feet, the shots left stains or powder-marks. This was to impeach the testimony of defendant that the deceased was killed in the manner stated, by pulling the gun towards him. The correctness of the diagram and the measurements do not seem to have been questioned, and were used and referred to by the various witnesses, including the defendant.

It is claimed in the brief for defendant that the court erred in admitting the evidence of Mrs. Carroll, wherein she testified that she saw a pistol in the possession of the defendant some time prior to the homicide, and also heard him make threats against the deceased. The defendant on cross-examination testified in reference to the breaking of a certain bullseye lantern the night before the homicide, which he had purchased, and which was broken by being knocked off the table by the deceased, and in this connection George Malley, a witness for the prosecution, testified that he was present at the time, and on that occasion heard the defendant make threats against the deceased. Under the circumstances, we think there was no error in admitting the testimony in question.

It is claimed that the court erred in giving the following instruction: "The court charges you that if any witness examined before you, or whose testimony taken elsewhere has been read to you, has willfully sworn falsely as to any material matter, it is your duty to distrust the entire evidence of such witness." This instruction is substantially according to the code, which is: "That a witness false in one part of his testimony is to be distrusted in others." (Code Civ. Proc., sec. 2061, subd. 3.)

It is also claimed that the court erred in refusing to give the following instruction: "The jury are further instructed that this doubt exists and goes with the defendant at every stage of the case, and applies to every element of the charge essential to its establishment as a proposition of law and as a matter of fact." This forms a portion of the tenth instruction asked by the defendant. The court, however, gave instructions covering fully the question of reasonable doubt; for instance, the following: "The court instructs the jury that upon the trial of a criminal case, if a reasonable doubt of any facts necessary to convict the accused is raised in the minds of the jury by the evidence itself upon any hypothesis

reasonably consistent with the evidence, that doubt is decisive in favor of the prisoner's acquittal." Again: "The court instructs the jury that under the law no jury should convict a citizen of a crime upon mere suspicion, however strong, or simply because there is a preponderance of all the evidence in the case against him, or simply because there is strong reason to suspect that he is guilty; but before the jury can lawfully convict they must be convinced of the defendant's guilt beyond a reasonable doubt." Again: "The jury are further instructed that the presumption of innocence is not a mere form to be disregarded by the jury at pleasure, but it is an essential, substantial part of the law of the land, and binding on the jury in this case as in all criminal cases, and it is the duty of the jury to give the defendant in this case the full benefit of this presumption and to acquit the defendant, unless the evidence in the case convinces them of his guilt as charged, beyond all reasonable doubt." And this line of instruction is repeated in several of the instructions given by the court, and if the portion of the instruction refused was well expressed and contained sound law, it is fully covered in others of like import, and no injury could therefore result to the defendant for failure to give the one in question.

In the brief it is further claimed that the court erred in refusing to give the following instruction: "The court instructs that previous threats, if proven beyond a reasonable doubt to have been made by the defendant, must be considered with reference to the relations existing between the defendant and the deceased, and if it is shown by the evidence that a reconciliation has taken place between the defendant and the deceased prior to the homicide, such threats are not to be considered as evidence of malice on the part of the defendant." But the court did give the following instruction asked by the defendant, which seems to cover the ground fully: "If the defendant was assaulted and placed under such circumstances that he had good reason to believe that it was necessary to defend himself from such attack to prevent the infliction of great bodily injury, the fact of any previous threat, or even the existence of any previous malice, if any is shown toward the deceased, could not take away from the defendant the right of self-defense. . . . It is solely the province of the jury to

determine whether the defendant in fact did not make threats against the deceased, and the weight to be given to evidence of alleged previous threats depends upon their character, the manner and the occasion of their utterance, nearness of time, and the particular circumstances surrounding their alleged making."

Of the twenty-one instructions given at the request of the defendant and forty-nine by the court of its own motion, the cases already noted are the only ones to which any objection is made. This of itself, aside from an inspection of the record, shows quite clearly that the court below scrupulously guarded the defendant in all of his constitutional rights to a fair and impartial trial.

Judgment and order affirmed.

Garoutte, J., Harrison, J., and McFarland, J., concurred.

Rehearing denied.