[Crim. No. 83. First Appellate District.—June 4, 1907.]

## THE PEOPLE, Respondent, v. GEORGE MEYERS, Appellant.

CRIMINAL LAW—GRAND LARCENY—SUPPORT OF VERDICT.—Where, upon the trial of a charge of grand larceny, there was legal evidence tending to prove the charge, the verdict of conviction is absolutely final, and cannot be reviewed upon appeal on the sole ground of insufficiency of the evidence to support the verdict.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco, and from an order denying a new trial. Carroll Cook, Judge.

The facts are stated in the opinion of the court.

E. W. Rowland, and J. J. Earle, for Appellant.

U. S. Webb, Attorney General, for Respondent.

KERRIGAN, J.—Defendant was charged with the crime of grand larceny, and upon the trial was found guilty. His motion for a new trial was denied, and appeal is taken from the judgment and from the order denying such motion.

The sole point made by the appellant is that the verdict of the jury is entirely unsupported by the evidence.

Briefly, the testimony is as follows:

Mrs. Grace Hopkins testified: "On the evening of November the 23d, 1905, at about midnight, in front of a hotel on Mason street in San Francisco, I saw Arnold, Noelke and defendant Meyers, all strangers to me. These three men and myself, at the invitation of Arnold, went into a saloon near by, and had several drinks of whisky, the last of which looked smoky. At that time I had $48 in a purse in my stocking, and on my fingers three diamond rings worth $125, $90 and $60, respectively. While in the saloon, in attempting to remove my glove, Arnold saw my rings and made a grab for my hand. I withdrew my hand and replaced my glove." She further testified: "I remember nothing that happened

for several hours after my drinking that smoky liquor. The next thing that I recollect is awakening in a filthy room in which I had never been before. I was in bed and not entirely dressed, but my clothes had been loosened; my dress was open; my corset strings had been cut and the corset removed and thoroughly searched; my shoes and stockings were on the floor and had been carefully examined, even the soles of the shoes having been inspected. My rings were not to be found, and on the dresser I discovered my purse inverted and empty.''

The defendant George Meyers testified: ''I am one of the defendants charged jointly with Arnold and Noelke. I have known Noelke for some time; I first met Arnold on the night of November 23, 1905. Noelke introduced us. About half-past one in the morning of November 24, 1905, the three of us were standing on Mason street in front of the Alturas, where Noelke lived, when Mrs. Hopkins passed by. She was intoxicated and asked us, 'Which of you is going to buy me a drink?' Arnold said that he would do so, and started down the street with her. Noelke and I followed, and the four of us went into a saloon near the Linwood. Arnold sat next to Mrs. Hopkins at the table. We had several drinks, but I did not notice any that appeared cloudy or smoky. We left the saloon about 2:30 A. M. and went into the Linwood, Arnold and Mrs. Hopkins leading the way. Arnold went to the desk and engaged a room, and the night clerk took him and Mrs. Hopkins up in the elevator. Arnold motioned to Noelke and me to remain in the office, and we did so. Later I took Noelke home to the Alturas; he was quite drunk. When I left him there he said to me: 'Arnold has a good job at the Park, and I'd hate to see him lose it on account of a woman. Don't let him oversleep, but send him out to work.' I returned to the Linwood, inquired of the clerk the number of the room occupied by Arnold and Mrs. Hopkins, and having been refused the key went upstairs and pounded on the door to arouse Arnold. This I was doing as an accommodation to my friend Noelke, as I had no interest in Arnold, having only met him the night before. Before I had received any response from Arnold I was compelled to desist by the night clerk, who told me that I was disturbing the whole house. I returned to the office, but presently

went upstairs again hoping that I might awaken Arnold, renewed the knocking at the door less violently than before, and was asked by Arnold what I wanted. I told him to get up; that it was time for him to go to work, and he said, 'All right; I'll be out in a minute.' I waited for him; presently he came out and asked me to go with him and have a drink; and we left the Linwood together. I had not entered the room occupied by Arnold and Mrs. Hopkins since she went up with Arnold in the elevator. I did not take or assist in taking any property from her person. On leaving the Linwood Arnold and I had a drink together, and he then asked me if I was acquainted at any pawnshop in the city. I said that I knew a clerk at a place on Kearny street, and Arnold asked me to take him there, and said that his girl had given him some things to pawn for her. So I went with him to Jacobs', and there he pawned three rings for $100. I had never seen the rings before that moment, and had no idea where he obtained them, except from his statement that his girl had given him some articles to pawn. We left the pawnshop together and had another drink. We then separated, and I do not know what Arnold did during the rest of the day. After that I saw Arnold nearly every day until we were arrested, about a week later. We were arrested by Officer Ryan, with whom I subsequently talked once or twice about the case. His account of our conversations was in the main correct. I never received any money from Arnold on account of the deal between him and the pawnbroker, nor on any other account; and I never said that I did.''

Charles Clark testified: ''I was on duty as night clerk at the Linwood Hotel on Mason street at about 2 o'clock, November 24, 1905, when Mrs. Hopkins, Arnold, Noelke and defendant Meyers arrived. Arnold came to the desk and engaged a room. I asked him his name, and he replied: 'Any old name; say Burke.' The room I assigned them was on the second floor. I entered the elevator to take the party up. Arnold and Mrs. Hopkins stepped in, and Noelke and Meyers started to follow when Arnold motioned them to stay back, and they retired. They remained in the office while I took the others upstairs. Mrs. Hopkins remarked while in the elevator that the place was 'dirty' and 'a pretty poor looking dump.' I showed them to the room, and saw them

enter and shut the door. The door locked with a snap lock. I then returned to the office where Noelke and Meyers were waiting. They remained for some time, then went out and returned. Noelke was quite drunk. At about 5:30 o'clock Meyers and he went outside, and Noelke did not return. Meyers returned in a few minutes. He said something about getting Arnold up and sending him to work. He learned which was his room and then ran upstairs. He asked me for the key of the room, which I refused to give him, as Arnold had given me particular instructions not to allow anyone to enter the room. Presently I heard a terrible racket upstairs. I went up and found Meyers in the hall outside of the door of the room which I had given to Arnold and Mrs. Hopkins; he was pounding and kicking on the door. I forced him to stop and to go down to the office with me as he was creating a sufficient disturbance to arouse the whole house. Presently Meyers went up again and made a good deal of noise, but was not quite so boisterous as on the former occasion, so I did not disturb him this time. I do not know whether he was in the room on these several trips or not. Presently he and Arnold came down together and left the hotel at about half-past 7.''

H. Wilkins and A. E. Trimple testified that they were clerks at the Jacobs pawnshop; that they knew Meyers; that on November 24, 1905, at about 8 o'clock in the morning, Meyers and another man, whose name was given as Burke, called at the pawnshop, and Burke pawned three diamond rings for $100.

It is conceded that it was Arnold under the name of Burke who pledged the diamond rings.

James L. Ryan, a member of the detective force of the city and county of San Francisco, testified that Meyers told him that he (Meyers) had received from Arnold a commission of $15 out of the $100 in the pawnshop transaction.

If there was no legal evidence to support the verdict of the jury in this case, as is contended by appellant, then there would be presented a question of law upon which, of course, this court would have jurisdiction to pass. The record, however, shows clearly there was legal evidence to prove all the facts constituting the crime alleged. In such a case the decision of a jury, in so far as this tribunal is concerned, is

absolutely final. (Const., art. VI, sec. 4, amended Nov. 8, 1903; *People* v. *Maroney,* 109 Cal. 279, [41 Pac. 1097]; *People* v. *Fitzgerald,* 138 Cal. 41, [70 Pac. 1014]; *People* v. *Donnolly,* 143 Cal. 398, [77 Pac. 177]; *People* v. *Gonzales,* 143 Cal. 606, [76 Pac. 962].)

In *People* v. *Maroney,* 109 Cal. 279, [41 Pac. 1097], it is said: "The power of a jury in determining the weight to be given to testimony is, within the rules of evidence, exclusive and supreme, and appeals to this court in criminal cases do not lie from the verdict of the jury upon controverted questions of fact, but solely upon propositions of law."

In *People* v. *Fitzgerald,* 138 Cal. 41, [70 Pac. 1014], it is said: "By the constitution appellate jurisdiction is conferred upon this court in 'criminal cases prosecuted by indictment or information in a court of record on questions of law alone.' Where there is evidence, therefore, to sustain the verdict, a question of law cannot arise, but only in a case where there is in effect an entire lack of evidence."

The judgment and order are affirmed.

Cooper, P. J., and Hall, J., concurred.