[No. 11309. Department One. December 26, 1913.]

THE STATE OF WASHINGTON, *Respondent*, v.

ADAM JAKUBOWSKI, *Appellant*.[1]

EMBEZZLEMENT—BY BAILEE OR PLEDGEE—CONTRACT OF BAILMENT. An agreement, whereby one went upon bonds to secure the payment of lost certificates of deposit, in consideration of which he was to hold the sums paid until such time as the bonds were released, is a contract of bailment, making the party a pledgee or trustee, within the meaning of Rem. & Bal. Code, § 2601, subd. 3, defining larceny by a bailee, pledgee, agent or trustee etc.

INDICTMENT AND INFORMATION—SUFFICIENCY—LANGUAGE OF STATUTE. An information charging the crime of larceny by a bailee, pledgee or trustee, substantially in the language of the statute, Rem. & Bal. Code, §2601, is sufficient.

EMBEZZLEMENT—INSTRUCTIONS—FAILURE TO REDELIVER MONEY ON DEMAND. Upon an information for larceny by embezzlement by a bailee, pledgee or trustee, it is proper to instruct that, if the accused received money to hold for the complaining witness until the accused was released from liability on certain bonds, without any agreement that he should have the use of the money, and failed to redeliver it within a reasonable time after being notified that he was released from the bonds, if he was so released, his failure would constitute the offense of larceny as defined by Rem. & Bal. Code, § 2601, subd. 3.

SAME—EVIDENCE—SUFFICIENCY. Upon a prosecution for larceny by embezzlement by a bailee, pledgee or trustee, the evidence sustains a conviction, making a case for the jury, notwithstanding a

[1]Reported in 137 Pac. 448.

sharp conflict in the evidence, where it appeared from the evidence of the state that the prosecuting witness paid the accused $5 for going on bonds to secure the payment of lost certificates of deposit, the money was delivered to the accused, and a written contract entered into, wherein he agreed to return the money to the prosecuting witness on the release of the bonds, the bonds were released, a civil action to recover the money was prosecuted to judgment, and the accused at first refused to pay the judgment, and thereafter attempted to arrange for payment by installments.

CRIMINAL LAW—APPEAL—REVIEW—VERDICT. The supreme court will not disturb a conviction for insufficiency of the evidence, where there was evidence to support the verdict.

CRIMINAL LAW — APPEAL — RECORD — MISCONDUCT OF COUNSEL— STATEMENT OF FACTS—AFFIDAVITS. Error cannot be assigned upon improper remarks by counsel in argument to the jury when they are not preserved in the record and certified to by the judge as actually having been made; and they cannot be shown by mere claims of counsel and exceptions allowed by the court, or by affidavits.

CRIMINAL LAW—TRIAL—MISCONDUCT OF COUNSEL. In a prosecution for larceny by embezzlement, in which it appeared that a judgment had been obtained against the accused in a civil action, which judgment had not been paid, it is not *per se* objectionable for the prosecuting attorney to argue to the jury that the presence of the accused was evidence that every step had been taken to get the money from him.

Appeal from a judgment of the superior court for King county, Gilliam, J., entered November 23, 1912, upon a trial and conviction of grand larceny. Affirmed.

*Jay C. Allen,* for appellant.

*John F. Murphy, Crawford E. White,* and *Reah M. Whitehead,* for respondent.

ELLIS, J.—The defendant was charged with the crime of grand larceny. The information was based upon the provisions of Rem. & Bal. Code, § 2601 (P. C. 135 § 695), and alleged, in substance, that, on June 15, 1912, the defendant, being authorized by agreement to hold $300 belonging to one Jan Majeuski, as bailee and trustee, "did then and there willfully, unlawfully, fraudulently and feloniously withhold and

appropriate the same to his own use, with intent to deprive and defraud the said Jan Majeuski thereof."

The substantial facts, as developed in the state's evidence, were as follows: The prosecuting witness, Majeuski, in December, 1910, claimed to have lost three certificates of deposit for $100 each, one issued to him by the Seattle National Bank of Seattle, and two by the First National Bank of Seattle. The banks refused to pay him the $300 represented by these certificates until he had furnished them indemnity bonds in double the amount deposited, executed by him and another acceptable bondsman. Majeuski was a Pole, and had lived in this country only a few years. He was directed to the defendant, a fellow countryman, as one who might be willing to sign the bonds. The defendant finally agreed to sign the bonds, and went to the banks with Majeuski, where his financial standing was investigated and found satisfactory, and on December 16 and 17, 1910, the bonds were executed by Majeuski and the defendant and delivered to the banks. The money represented by the lost certificates was paid by the banks to Majeuski, who turned it over to the defendant. The defendant, accompanied by Majeuski, took the money to another bank and deposited it in the defendant's name. Majeuski testified that, at the defendant's direction, he remained outside of the latter bank when the deposit was made, and supposed that the defendant was depositing the money to his (Majeuski's) credit. He further testified that he paid the defendant five dollars for signing the bonds, and that the defendant told him that he (the defendant) would return the money in two or three months. On December 19, the two men went to the office of an attorney, Robert Welch, for the purpose of having some writing drawn up showing the terms upon which the defendant was to hold the money. Majeuski, who claimed to have little understanding of English, testified through an interpreter. He claimed that the attorney first prepared one paper, which was destroyed, and then prepared another in duplicate, which was executed by Majeuski and the

defendant, one of the duplicates being delivered to each of them. The latter paper was introduced in evidence, and reads as follows:

"Seattle, Washington, December 19th, 1910.
"Whereas John Majeski has lost one certificate of deposit for the sum of two hundred dollars on the First National Bank of Seattle and a certificate for the sum of one hundred dollars on the Seattle National Bank of Seattle, and whereas Adam Jakubowski has this day given to the said banks his bond for the payment of the said sums of money, Now therefore the said Adam Jakubowski is to have and to hold the said sum of money to wit: three hundred dollars until such a time when the said banks release the said Adam Jakubowski on said bonds and when said bonds are so released then the said money, to wit: the sum of three hundred dollars is to be delivered over and unto the said John Majeski.
Witness:                                       Jan Majeuski
Robert Welch.                                  Adam Jakubowski."

In January, 1911, Majeuski asked the defendant for some of the money, and the defendant refused to give it to him, threatening violence if he persisted in demanding it. On January 25, 1911, Majeuski brought a civil action against the defendant, demanding the $300 and costs. The complaint alleged fraud on the part of the defendant, and, in addition to the money demand, asked for a cancellation of the above agreement. In this civil action an amended complaint was filed, on September 30, 1911, alleging that the bonds given to the banks had been cancelled, and again asked for judgment for the $300 and costs. At this time, one of the bonds had not been cancelled, and it was admitted on the present trial that one of the bonds was not cancelled until the day before the trial of the civil action. The attorney for Majeuski in the civil action testified that this was through an oversight, due to the fact that two bonds were given to one bank and the third to another, and that he, supposing that there were only two bonds, overlooked the fact that one of the two bonds given to one of the banks was not released; but that, on the

release of the one bond, it was the intention to release the defendant on both the bonds and on all liability to the bank.

The civil action was tried in May, 1912, and resulted in a verdict and judgment for the plaintiff for $288, being the $300 less the costs, which were awarded to the defendant because one of the bonds had not been released when the action was instituted. The attorney for Majeuski in the civil action testified that the defendant at first absolutely refused to pay this judgment, stating that he would never pay it; that afterwards, when execution was issued, he offered to pay the judgment in installments of $50 each at intervals of sixty days, which arrangement the attorney refused to consider, and that no part of the judgment has been paid. Shortly after this, the information in the present case was filed.

The evidence on behalf of the defendant was directed to the support of his contention that he received nothing for going on the bonds with the bank, but that he agreed to go on these bonds in consideration that he receive the money as a loan for a period of six years at six per cent interest, that being the period for which he would be liable on the bonds. The defendant testified that he met the prosecuting witness in a certain saloon; that the prosecuting witness informed him of his predicament and requested the defendant to go upon his bonds in order to secure the money from the banks. As to what was verbally agreed to, he testified:

"I says I am going to see a lawyer and fix a paper. Of course I don't want to sign your bond for $600 at the bank if I have got no security. I says I will tell you the bank will never release my bond for six years; you hear that? He says yes. I says if I sign your surety bond they will give it to you, but I am the security. He says you give me that money just the same as the bank. If the bank after six years releases you, you pay my money back, and at any time if I want some five or ten dollars will you give it to me? I says yes, I will do that. I says I will tell you, Majeuski, if I take that money for six years I will use it and pay you six per cent interest. He says all right, you give me that; it is better

than for the bank because the bank will never pay me that money. I says all right, I will do that. And I went with him to the bank and to the lawyer and fixed that agreement."

He testified that, on going to the attorney's office, he first saw the attorney's stenographer and asked him to make a promissory note; that shortly afterward Mr. Welch, the attorney, came in and made out a promissory note for six years, but afterward explained that if the defendant signed the promissory note and Majeuski should transfer it to some third person, the defendant would be subject to a double liability by reason of his note and his bonds with the bank; that the note was then torn up and the attorney drew up the foregoing agreement, which was executed by the prosecuting witness and the defendant in duplicate, one of the agreements being delivered to each. He further testified that Majeuski was present when the defendant deposited the money in the bank in his own name, and that the agreement was drawn up and signed in the attorney's office before the bonds were signed and the money secured from the banks. In this he is contradicted both by the testimony of the prosecuting witness and by the dates of the papers' themselves. He also testified that Majeuski paid him nothing for signing the bonds. He admitted that he has paid no part of the money, stating that he is unable to do so, but that he has made many unavailing efforts, which he related in detail, to secure a loan with which to pay the money. One Kalinowski testified that, in December, 1910, in a conversation in a saloon, he heard the prosecuting witness tell the defendant he could use the money for six years until the banks released the bonds, the defendant to pay six per cent a year for its use. As to what occurred in the attorney's office, the stenographer testified that, some time in December, 1910, Majeuski and the defendant came into Mr. Welch's office; that Majeuski conversed in English, which he could speak, and seemed to understand very well; that the defendant told the witness that Majeuski had agreed to let him have the money for five or six years, and that

Majeuski explained that he was willing to do so because the
defendant had gone on his bonds; that Mr. Welch came in
and explained to the defendant the danger of a double liability
in case he gave a note while the bonds were still in the hands
of the bank, and that the agreement above mentioned was then
drawn up in duplicate.

Robert Welch, the attorney, testified that, when he came to
his office one morning, Majeuski and the defendant were there
with the stenographer; that he took them into his private
room, where Majeuski explained that he had lost the certifi-
cates; that he was going to leave town and wanted the de-
fendant to have the money and take care of it for him; that
the witness made out a promissory note for $300, running for
six years, explaining to the parties that, under the statute
of limitations, the defendant would be liable on the bonds for
six years; that he then advised the defendant not to sign the
note, and explained to him the dangers of a double liability in
case the certificates were presented to the bank and the note
endorsed to some third person; that the note was then torn
up, and that the witness dictated the agreement as above
quoted. He further testified that Majeuski stated that he
wanted the defendant to take care of the money for him, as he
was afraid to leave it in the bank, and that Jakubowski could
use the money for his own personal use, as he had loaned the
money and wanted the defendant to have it, but that he could
not recall whether anything was said about interest or not;
that he dictated the agreement according to his understand-
ing from their conversation, in which they both said the de-
fendant was to keep the money, and that he thought it would
suit their purposes.

There was also introduced on behalf of the defendant an
answer, prepared for filing in the civil action, in which the
matters as now claimed by the defendant were set up as a de-
fense in the civil action, that answer having been prepared
before the filing of the information in this action. The an-
swer, though prepared, was never filed. At the close of the

evidence on behalf of the state, the defendant challenged its sufficiency and moved for a dismissal, which was denied. The jury found the defendant guilty. Motions for a new trial and in arrest of judgment were overruled. Judgment and sentence were pronounced and the defendant appealed.

The appellant assigns as error the overruling of the demurrer to the information, the overruling of the defendant's challenge to the sufficiency of the evidence, the giving of a certain instruction to the jury, the overruling of the motion in arrest of judgment, and the denial of a new trial. Under these assignments, the appellant presents and argues three questions: (1) Assuming the facts as claimed by the state to be true, did they constitute larceny under the statute, and did the court err in so instructing the jury? (2) Was the evidence sufficient to withstand the motion challenging the sufficiency of the evidence, the motion in arrest of judgment, and the motion for a new trial? (3) Should a new trial have been granted because of misconduct of counsel for the state?

I. If the written agreement spoke the intention of the parties, it clearly constituted a contract of bailment by pledge and made the appellant a pledgee and trustee for the pros-- ecuting witness. As to whether it did, in fact, speak the intention of the parties, the evidence was, as we have seen, sharply conflicting, but this phase of the argument proceeds upon the assumption that the facts, as claimed by the state, were true. The statute, Rem. & Bal. Code, § 2601 (P. C. 135 § 695), subdivision three, reads as follows:

"Every person who, with intent to deprive or defraud the owner thereof . . . (3) Having any property in his possession, custody or control, as bailee, factor, pledgee, servant, attorney, agent, employee, trustee, executor, administrator, guardian or officer of any person, estate, association or corporation, or as a public officer, or a person authorized by agreement or by competent authority to take or hold such possession, custody or control or as a finder thereof, shall secrete, withhold or appropriate the same to his own use or to the use of any person other than the true owner or person en-

titled thereto . . . steals such property and shall be guilty of larceny."

The information charged that the defendant was authorized by agreement to take and hold possession of the money as servant, agent, bailee and trustee for Majeuski, and willfully, unlawfully, fraudulently and feloniously withheld and appropriated it to his own use with intent to deprive and defraud Majeuski thereof. No demurrer to the information appears in the record, but, in any event, the information, which charged the crime practically in the language of the statute, was sufficient. *State v. Turner*, 10 Wash. 94, 38 Pac. 864; *State v. Whiteman*, 9 Wash. 402, 37 Pac. 659; *State v. Whitworth*, 30 Wash. 47, 70 Pac. 254; *State v. Bogardus*, 36 Wash. 297, 78 Pac. 942.

The court instructed the jury:

"If, however, you should find that the understanding and agreement between the defendant and the complaining witness was that the defendant should receive the said sum of $300 and hold it to be redelivered to the complaining witness, Jan Majeuski, upon the release of the defendant from said bonds and that there was no agreement or understanding between the said defendant and the said Jan Majeuski that the defendant should have the use of said money, then it would be the duty of the defendant to re-deliver said money to the said complaining witness within a reasonable time after being informed that the defendant was released from said bonds, if you do find that he was so released, and failure so to do, if you should find against the defendant upon the other issues in the case, would constitute the offense of larceny."

We find no error in this instruction. If, as assumed, the facts as to the agreement and intention of the parties were as claimed by the state, the instruction clearly stated the law applicable thereto.

II. At the close of the state's case in chief, there was no evidence tending to show that the written agreement did not speak the intention of the parties. The testimony of the prosecuting witness that he paid the appellant five dollars for

going on his bonds with the banks tended, in some degree, to
prove that it did speak that intention. The institution of the
civil action before the bonds had all been released, if unex-
plained, might have tended to show the contrary, but the at-
torney who represented the plaintiff in the civil action had
explained that this was through a mere oversight. There
was clear evidence that the appellant, after the bonds were
all released and the claim reduced to judgment, refused to re-
turn the money. There was then no evidence that he claimed
that the transaction constituted a loan. His reception of
the money, the written agreement to return it on his release
from the bonds, and his refusal to do so, constituted compe-
tent evidence tending to establish every element of the crime
charged. Its weight was for the jury, as was its credibility.
The testimony that the defendant at first said he would never
pay the money, but afterwards endeavored to make an ar-
rangement to pay it in installments, did not negative the
criminal intent raised by the failure to pay it. On the con-
trary, it tended to prove that the appellant had appropriated
the money to his own use, which, if he held the money as
pledgee or bailee, was of the very essence of the crime. The
motion challenging the sufficiency of the evidence at the close
of the state's case was properly overruled.

At the close of all of the evidence, the situation remained
unchanged, except that a sharp conflict had been raised as to
whether the written agreement spoke the actual intention
of the parties. In our statement of the case, we have detailed
every salient feature of the evidence, and while it appears to
this court as persuasively negativing a criminal intention on
the appellant's part, its weight and the credibility of the ap-
pellant and his witnesses were for the jury. As we have seen,
there was adduced by the state competent evidence tending to
prove every element of the crime as charged. The trial court
denied the appellant's motion in arrest of judgment and re-
fused to grant a new trial upon conflicting evidence. In such
a case, whatever our own opinion as to the weight or pre-

ponderance of the evidence, we cannot reverse the action of both the trial court and the jury. To do so would be to invade the province of both. It would be to substitute our judgment for that of the jury as to a question of fact upon conflicting evidence, and our discretion for that reposed by statute in the trial court.

"This court has heretofore announced that it will not disturb verdicts of this character, on the ground of alleged insufficiency of evidence, where there is evidence to support the verdict, although it may not be of the most convincing kind. Both the jury and the trial court have the opportunity to hear and see the several witnesses, to note their manner as to apparent candor and truthfulness, and are therefore better prepared to pass upon the credibility of their testimony than is this court with only a bare record of the words spoken by the witnesses. The weight of the evidence having been first passed upon by the jury, and next by the trial judge in denying the motion for new trial, we shall not undertake to say that they were wrong." *State v. Ripley,* 32 Wash. 182, 72 Pac. 1036.

See, also, *State v. Pacific American Fisheries,* 73 Wash. 37, 131 Pac. 452; *State v. Bailey,* 67 Wash. 336, 121 Pac. 821; *State v. Murphy,* 15 Wash. 98, 45 Pac. 729; *State v. Kroenert,* 13 Wash. 644, 43 Pac. 867; *State v. Coates,* 22 Wash. 601, 61 Pac. 726; *State v. Bailey,* 31 Wash. 89, 71 Pac. 715. The same general rule prevails in other jurisdictions. 12 Cyc. 906, 907, 908; *Miller v. Territory,* 9 Ariz. 123, 80 Pac. 321; *People v. Fitzgerald,* 138 Cal. 39, 70 Pac. 1014; *Mow v. People,* 31 Colo. 351, 72 Pac. 1069; *People v. Williams,* 133 Cal. 165, 65 Pac. 323. The crucial question upon the evidence was that of the good or bad faith of the appellant in appropriating the money to his own use. This was clearly a question for the jury. *State v. Buchanan,* 43 Wash. 400, 86 Pac. 650; *State v. Lewis,* 31 Wash. 75, 71 Pac. 778; *State v. Maines,* 26 Wash. 160, 66 Pac. 431.

III. It is earnestly claimed that a new trial should have been granted because of alleged improper statements of counsel for the state in his closing argument. No part of this

argument is presented in the record. The only reference to it in the record of the trial is found in the following objection interposed by counsel for the appellant at the close of the argument:

"Mr. Allen: If you honor please, counsel for the state has just stated to the jury in his closing remarks that the fact that this defendant is now before them is evidence to them that every step has been taken to get this money from him, and for that reason they should determine that the defendant would not pay this money. I except to this statement and I ask the judge to charge the jury now in response to this statement, that the fact that the defendant is here is no evidence at all whether he is guilty or innocent. He is presumed to be innocent until proven guilty, and I ask the judge to so charge the jury.

"The Court: The stenographer will take down the exception."

The same thing is, in substance, repeated in an affidavit of counsel for the appellant in support of the motion for a new trial. This objection is unavailing for two reasons. In the first place, the alleged objectionable remarks were made in the presence of the court. They could have been, and should have been, preserved in the record in context, and certified by the trial judge as actually having been made. As the record stands, the trial judge merely certified that counsel for appellant claimed that they were made, and objected thereto. The recital of matters occurring in the presence of the court in the affidavit submitted on motion for a new trial was, as we have repeatedly held, an insufficient preservation of the record for the purposes of review.

"As to the objection raised by the appellant to the remarks alleged to have been made by the counsel of the prosecuting witness in his closing argument to the jury, this court is unable to determine from the record that such remarks were made. It is true there is an affidavit on file to that effect, and this affidavit is made a part of the statement of facts, but the certificate of the court to the statement of facts shows nothing more than that the affidavit was made;

it does not attempt to settle the truthfulness or untruthfulness of the matters set forth in the affidavit." *State v. McGonigle*, 14 Wash. 594, 45 Pac. 20.

See, also, *Maryland Casualty Co. v. Seattle Elec. Co.*, 75 Wash. 430, 134 Pac. 1097; *Loy v. Northern Pac. R. Co.*, *ante* p. 25, 137 Pac. 446. The same is true of counsel's objection at the close of the argument. In a case closely analogous, we said:

"Error is assigned on a statement made by the prosecuting attorney in his argument to the jury, but the only reference to such statement in the record is found in the following objection, interposed by counsel for appellant, at the close of the testimony: 'I wish to object to the statement by the prosecutor that the very fact that this case must go to the jury is a guarantee of the legal sufficiency of the evidence to convict this man.' The record does not show that any such statement was made by the prosecutor, or that the court's attention was otherwise directed to it if made. There is, therefore, no ruling of the court before us for review." *State v. Poyner*, 57 Wash. 489, 107 Pac. 181.

See, also, *Lane v. State*, 59 Tex. Cr. 595, 129 S. W. 353; *State v. Gruber*, 19 Idaho 692, 115 Pac. 1; *Holland v. State*, 61 Tex. 201, 134 S. W. 693; *State v. Duncan*, 116 Mo. 288, 22 S. W. 699; *State v. Levy*, 126 Mo. 554, 29 S. W. 703.

In the second place, the language attributed to counsel for the respondent was not objectionable *per se*. The context, if we had it before us, might show that the argument was entirely legitimate. If the jury believed that the written agreement was the agreement upon which the minds of the parties met when the money was turned over to the defendant, then the jury was at liberty to find that the contract was one of bailment. It was, therefore, legitimate argument to state that if he, knowing that he had no right to use the money, had so disabled himself from returning it that he could not pay it and did not pay the judgment rendered for the money in the civil action, that would be strong evidence that he had,

with fraudulent intent, appropriated the money to his own use.

Upon the whole record, we find nothing which would warrant a reversal. The judgment is affirmed.

Crow, C. J., Main, Chadwick, and Gose, JJ., concur.