[Crim. No. 591.   First Appellate District.—March 22, 1916.]

THE PEOPLE, Respondent, v. VERNON W. FOWLER, Appellant.

CRIMINAL LAW—MURDER—SUPPORT OF VERDICT.—In a prosecution for murder, where the testimony upon which the defendant was convicted was circumstantial, the judgment of conviction will not be set aside on appeal, where it cannot be said that there was not evidence to sustain the verdict, even though it cannot be said that a strong and convincing case was made out against the defendant.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco, and from an order denying a new trial.   Franklin A. Griffin, Judge.

The facts are stated in the opinion of the court.

McClellan & McClellan, for Appellant.

U. S. Webb, Attorney-General, and John H. Riordan, Deputy Attorney-General, for Respondent.

KERRIGAN, J.—The defendant was charged with the crime of murder, alleged to have been committed on the

eighteenth day of December, 1914, one William Fassett being the victim. The defendant was tried, found guilty of murder in the first degree with the punishment fixed at life imprisonment, and he was sentenced accordingly. This appeal is from the order denying his motion for a new trial and from the judgment.

No complaint is made as to any of the rulings of the trial court on the admission or rejection of evidence. The defendant did not take the witness-stand himself, nor was any evidence introduced in his behalf. The sole point relied upon for a reversal of the judgment and order is the alleged insufficiency of the evidence to sustain the verdict.

On the evening of December 18, 1914, three men, engaged in burglarizing a house situated on Oak Street, between Ashbury and Clayton Streets, in San Francisco, during the absence of the occupants, were interrupted by their return, and, in the excitement which ensued, one of the latter was shot and killed by the burglars, who immediately fled and were seen to run into what is known as the Panhandle, a portion of Golden Gate Park covered with trees and shrubbery. Soon thereafter two men were seen to emerge from the opposite side of the Panhandle and disappear, followed in a few moments by a third man, the latter without a hat. While engaged in the burglary the men concealed their features with pillow slips, and consequently the occupants of the house were unable to describe or identify the men. One witness, however, was able to testify that the eyes of one of the intruders were like the eyes of the defendant, in that they were bright and had an expression of positiveness of character. The principal circumstance relied upon by the prosecution to connect the defendant with the homicide is that a few hours ·after its commission a brown hat, bearing on the sweatband thereof the defendant's initials, was found at a place about where the three men crossed the Panhandle, and the prosecution advance the theory that in running across that portion of the park the defendant's hat was knocked from his head by a limb of a tree, and that in stopping to pick it up he became separated from his companions. Other evidence in the case is as follows: Vincent P. McDevitt lived on Fell Street facing the Park Panhandle, and about opposite to the house on Oak Street where the homicide was committed. Hearing a pistol shot he went to the front porch of his residence, and in a few

moments noticed a man emerging from the shrubbery of the Panhandle at a point about one hundred feet easterly from his residence, and who walked by his house, the witness observing him from his porch, which was about eight feet above the sidewalk. As he was passing, McDevitt inquired of him what had happened, and the hatless stranger replied, ''I think it was a burglary.'' Comparing the appearance of this man with the defendant, McDevitt testified that he had dark hair and was baldheaded, and referring to the defendant added, ''This man is dark-haired and baldheaded and they haye the same resemblance in common.'' He further described the man he saw as between five feet seven or eight inches in height, and quite but not so very stout—which description seems to fit the defendant. Finally McDevitt testified that he could name nobody in the world that looked as much like the defendant as the hatless stranger he saw that night.

Another witness, Lillie Lark, who resided in the neighborhood of Fell Street, and apparently an unwilling witness, testified that she heard a shot on the night in question, and went to the front steps to see what had happened; she saw a man cut across the park almost opposite her residence, and when he got over to her side of the street she spoke to him, asking, ''What is the matter?'' The man replied that it seemed to be a hold-up. He had no hat on.

Although none of the residents of the burglarized house smoked, the police officer who examined the premises immediately after the homicide found a cigarette butt there, and an expert chemist called by the people testified that the tobacco found therein was similar to the tobacco found on the person of the defendant when he surrendered himself to the police authorities.

A police officer examined the Panhandle in the vicinity of where the three men crossed it a short time after their passage, and found three sets of footprints not on any of the regular paths traversing it, and along the tracks thus made gathered up pieces of string and a pair of gloves identified as having been taken from the burglarized house. The hat was also found near these tracks. One set of these footprints was found to be about the size of the defendant's shoes. Three days after the murder the defendant voluntarily entered police headquarters· and announced who he was. On being shown the brown hat he admitted it was his. He told the

officers that on reading the newspapers containing some details surrounding the murder he became excited, left his hotel on Saturday, December 19th, the day after its commission, rode to within a short distance of San Mateo, and stopped for the night in a small uninhabited shack; that on Sunday he went to San Mateo and that night again returned to the shack, and that on Monday morning he walked to San Francisco, boarded a Mission Street car near Silver Avenue and rode to police headquarters. The officers noticed at this time that the defendant's shoes were neither muddy nor wet, although it had been raining. The officers requested the defendant to take them to the shack described, but he refused to do so. In his voluntary statement he also told the police officers that he had discarded the old brown hat found in the Panhandle ten days before the homicide, giving two different versions of how he disposed of it. His statement as to the time he disposed of this hat was contradicted by the manager of the hotel where he lived, who testified that the defendant wore the hat in question up to within two days of the murder. On being asked where he procured the hat he was wearing when he entered the police headquarters the defendant replied that he had bought it "ten or twelve days ago for $2.50 at Wolff's hat store on Grant Avenue," but was unable to locate the store within three or four blocks of its situation; and when asked on which side of Grant Avenue the store stood he refused to reply. Wolff, the hatter, called as a witness, testified that he had not carried in stock a hat such as the defendant referred to for six months, and that he had never charged more than $1.50 for hats sold by him.

For the purpose, doubtless, of showing that the brown hat had not been lying in the Panhandle prior to the evening of December 18th, the prosecution called a witness who, without objection, qualified as an expert in such matters; and he testified that he could tell from an examination of the sweatband of the hat approximately how recently it had been worn; and that, on the nineteenth day of December, when he examined the hat found in the Panhandle, it had, in his opinion, been worn within twenty-four hours of that time. Finally, on the cross-examination of the witnesses for the prosecution by the attorneys who at that time represented the defendant, it was shown that the defendant had theretofore been convicted of a felony and that he was a user of morphine.

From the evidence in the record it would appear that the
man who was seen to come out of the Fell Street side of the
Panhandle was one of the three men who had been engaged
in the burglary on Oak Street, and that in passing through
that part of the park he had lost his hat. That man and the
defendant appeared to the witness McDevitt to be one and the
same. It also appears that the hatless man was cool and col-
lected. If connected with the homicide, by thus leaving the
scene of the crime leisurely he adopted the best method for
disarming suspicion, and showed himself an experienced crim-
inal. The defendant in this case was an ex-convict. When
the defendant read in the San Francisco newspapers that his
hat had been found near the course taken by the escaping
criminals, and learned that the police were looking for him,
it may be that he did not go to San Mateo, for he was seen
in San Francisco after the time that he said he left there,
and he refused to point out to the police officers the shack
in which, according to his account, he slept for two nights,
and the condition of his shoes indicated that he had not, as
claimed by him, walked from there into San Francisco. If
in fact he did not go into San Mateo County, his narrative
of his doings there may have been concocted for the purpose
of protecting friends who were helping to conceal him, among
whom may have been his associates of the night of the 18th.
If, on the other hand, his statement that he visited San Mateo
County be true, his going there may be regarded as flight
from the scene of the crime, which the jury had the right
to consider as evidence of guilt. In any event, the defendant
was aware that the police were searching for him, and prob-
ably realized that on account of his past record they were
well equipped to capture him, and concluded that the best
way to escape arrest and prosecution was by walking right
into the police headquarters, admitting that the hat found
was his, but to claim that he had thrown it away ten days
before the homicide. He told two different stories of how he
had disposed of this hat, and he was contradicted by his land-
lady as to the time he had parted with its possession. There
is also a conflict between him and the witness Wolff, the
hatter, as to when he bought the new hat, and as to how much
he paid for it. The tobacco in the cigarette left on the bur-
glarized premises was like the tobacco found in the defend-
ant's possession, and it was a kind of tobacco seldom used in

cigarettes. It is also significant that in his statement to the police the defendant did not disclose his whereabouts on the night of the murder. The testimony upon which he was convicted was circumstantial; and while we cannot say that a strong and convincing case was made out against him, we are equally unable to say that there is not evidence to sustain the verdict—in which event only would we be warranted in setting aside the judgment of conviction. (*People* v. *Meyers,* 5 Cal. App. 674, [91 Pac. 167].)

The judgment and order are affirmed.

Lennon, P. J., and Richards, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on May 18, 1916.