[No. 11852-5-III. Division Three. May 13, 1993.]

THE STATE OF WASHINGTON, *Respondent,* v. MIGUEL ALVARES SALAMANCA, *Appellant.*

*Hugh M. Spall,* for appellant.

*Jeffrey C. Sullivan, Prosecuting Attorney,* and *Howard W. Hansen* and *Bruce Hanify, Deputies,* for respondent.

SHIELDS, C.J. — A jury convicted Miguel Salamanca of five counts of accomplice to first degree assault for driving the vehicle from which multiple gunshots were fired at five people in another vehicle. Mr. Salamanca was sentenced to five terms within the standard range, to be served consecutively. He appeals, contending trial errors and newly discovered evidence entitle him to a new trial; or four of the con-

victions should be reduced to second degree assault; or his sentences should run concurrently. We affirm.

On April 8, 1991, Tawnya Gee picked up Kelly Adkins in her 1984 Mustang. Charles Tatum, Maurice Smith and Robert Walker joined them around dusk to "[w]aste gas and waste some time" driving around Yakima. As the five young people in the Mustang were driving around at approximately 8:15 p.m., they pulled alongside an El Camino preparing to turn right at the intersection of 6th Street and Pacific Street. Charles recognized the driver as Miguel Salamanca, with whom he had had several fights and other encounters. Charles leaned forward from his seat on the rear passenger side and, through the open window of the passenger seat occupied by Maurice, shouted a derogatory comment to Miguel, identifying him by name. The other occupants of the Mustang all looked at the El Camino and Miguel, then the two cars parted without further incident.

Between 20 and 45 minutes later, the Mustang was stopped at the intersection of 7th Street and Race Street when a car pulled up behind them, put on its bright lights and honked its horn. The occupants of the Mustang all turned around to see who was behind them but could not determine who it was because of the glare from the bright headlights. As Tawnya turned left, they were able to see that the car behind them was an El Camino. Although the windows of the El Camino were tinted, Tawnya, Kelly (in the middle of the back seat) and Charles all stated they were able to see that the driver was Miguel because his window was rolled down.

As the El Camino followed them through the turn, Tawnya sped up and tried to get away. The El Camino pursued and someone in it began shooting at the Mustang. As Tawnya tried to evade the El Camino by swerving, speeding and running stop signs, her companions ducked to avoid the gunfire. Five or six shots were fired in fairly close succession, then there was a pause and more shots were fired. At least three shots hit the Mustang; one in the license plate, one in the gas tank, and one through the back window. One bullet fragment

hit Tawnya in the head. Tawnya was finally able to escape the El Camino. Shaken, the occupants of the Mustang proceeded to a friend's house where they looked at Tawnya's wound. Tawnya and Kelly then drove to the nearest hospital to get the wound treated. It required stitches.

On April 23, 1991, Mr. Salamanca was charged with five counts of accomplice to first degree assault. The information alleged Mr. Salamanca, with respect to each individual count, acted with intent to inflict great bodily harm upon the named person.

At his June trial Mr. Salamanca presented an alibi defense suggesting he was elsewhere while his car was being used to chase the Mustang. Mr. Salamanca's landlord, Juan Gonzalez, testified Mr. Salamanca parked his El Camino at home between 5 and 5:30 p.m., left the keys with him, then drove away with a friend in a truck. Later, after dark, Mr. Gonzalez heard someone start the El Camino and saw it drive away, but he did not see who it was. He testified it was returned about 9 or 9:30 p.m.; his wife told him it was back.

Catalina Arrellano testified Mr. Salamanca was with her brother Rigoberto when Rigoberto arrived in his Dodge truck at her mother's house about 6:15 or 6:30 p.m. Rigoberto borrowed some money from her so he could go drinking. Ms. Arrellano testified they both returned about 9:10 or 9:30 p.m., in the same truck. She put the telephone on the front porch for them and saw Mr. Salamanca on the phone for about 10 minutes. Then she took a shower. When she got out, they were gone.

Nora Ortiz, Mr. Salamanca's ex-girlfriend, testified she received a phone call from him at about 8:30 or 9:30 p.m. and talked with him for about an hour to an hour and a half. Ms. Ortiz further testified Mr. Salamanca and Rigoberto drove up in Rigoberto's truck and dropped her brother off at her house at about 11 p.m. On cross examination, however, she stated the phone call occurred the night Mr. Salamanca was arrested, which was the day after the shooting.

Public defenders' investigator Rex Burnam also testified on Mr. Salamanca's behalf, stating that he could not identify a driver in the El Camino during a recreation of the incident at the intersection of 7th and Race Streets. During Mr. Burnam's testimony, defense counsel sought authentication and admission of two photographs of the El Camino taken in broad daylight. One was admitted, the other was not, under the following circumstances:

Q: [DEFENSE COUNSEL] Exhibit 34, what does that picture show, sir?

A: [MR. BURNAM] That is the passenger side of the vehicle, taken from the front to the back. Also shows the entire windshield.

Q: And 35 shows what, sir?

A: Again, basically the same photo.

Q: Is there anything else added to 35?

A: There's somebody standing with his arm up in the air, head inside the vehicle.

Q: Does that picture accurately depict what you would be able to see of that person standing alongside the vehicle with his head inside?

A: Yes, sir, it does.

THE COURT: No, that question will not be asked. No camera can approximate a human eye, period. Not in this courtroom.

Q: [DEFENSE COUNSEL] Were you able, at that time, to look through the windshield and distinguish and tell who the person was that was standing by the driver's door?

A: No, sir, I could not.

Q: That was in broad daylight?

A: Yes, sir.

[DEFENSE COUNSEL]: I'd offer 34 and 35.

[THE PROSECUTOR]: Your Honor, the state would object.

THE COURT: Number 34 would be admitted. Number 35 will not.

At the close of trial, the jury returned five guilty verdicts.

A month after trial Mr. Salamanca moved for a new trial, contending two witnesses who could substantiate his alibi had since come forward; they were the younger brothers of Ms. Ortiz.[1] The court denied the motion, concluding the

---

[1] According to Mr. Burnam's affidavit, which accompanied the motion, the boys stated they saw Rigoberto Arrellano drive by the Ortiz residence at about 9

defendant did not exercise due diligence to discover the evidence, which was cumulative of his alibi and would not likely have changed the outcome of the trial.

On September 5, 1991, the court sentenced Mr. Salamanca within the standard range for each conviction: 123 months on count 1 (Ms. Gee) and 93 months on each of the remaining four counts. The court ordered the sentences to run consecutively under RCW 9.94A.400(1)(b) because, although the convictions resulted from a single course of criminal conduct, there were five separate victims.

Mr. Salamanca contends he should be given a new trial, the evidence is insufficient to support four of the convictions and his sentences should run concurrently rather than consecutively.

I

NEW TRIAL

A. Exhibit 35. Mr. Salamanca contends the court abused its discretion by excluding exhibit 35. He argues Mr. Burnam authenticated the photo, stating it accurately showed what a person could observe under lighting conditions superior to those at issue, and any defects in the conditions under which the photo was taken go to the weight of the evidence, not its admissibility. Mr. Salamanca also argues the court's exclusion of the photograph constituted an impermissible comment on the evidence, requiring reversal.

The primary issue at trial was whether any of the occupants of the Mustang could identify the driver of the El Camino under the conditions existing on the night of the

---

p.m. on the night of the shooting. He was driving an El Camino which they knew belonged to Miguel Salamanca. At about the same time, one of the boys was aware his sister was talking on the telephone; he later learned she was talking to Mr. Salamanca. A short time after Rigoberto drove by, they heard shots to the southeast. A couple of minutes after the shots they saw Rigoberto drive by again, still alone. The next day they learned of the shooting, which occurred about three blocks from their home, but they did not want to be involved.

shooting. Pretrial, the court ruled Mr. Burnam could orally relate to the jury the details of his out-of-court demonstrative experiments with the El Camino, but limited Mr. Burnam's testimony to what he saw. Defense counsel was warned Mr. Burnam would not be allowed to state what others could or could not have seen.

When Mr. Burnam identified exhibit 34, he described what was depicted in the photo. Asked about exhibit 35, Mr. Burnam indicated it showed basically the same thing with the addition of a person standing alongside the vehicle with his arm in the air and his head inside the vehicle. Counsel then asked whether the picture "accurately depict[s] what you would be able to see of that person standing alongside the vehicle with his head inside?" The question clearly required a prohibited deduction or conclusion, contrary to the court's ruling. Moreover, as the court observed, the question went beyond authentication and asked the witness to compare the acuity of the camera that took the photograph against the acuity of a human eye. Viewed in context, the court was limiting the testimony in line with the pretrial ruling.

■ The court's exclusion of the photograph was within its discretion. *State v. Hoffman*, 116 Wn.2d 51, 88, 804 P.2d 577 (1991); *Toftoy v. Ocean Shores Properties, Inc.*, 71 Wn.2d 833, 836, 431 P.2d 212 (1967). Exhibits 34 and 35 showed the general condition of the car and the daytime glare off the windshield from a particular perspective, as it was captured by a camera. Given the difference in light and weather conditions and the perspective of the viewer in the photograph, compared with the victims' testimony, the court's ruling was not an abuse of discretion. *See Fabbio v. Diesel Oil Sales Co.*, 1 Wn.2d 234, 238, 95 P.2d 788 (1939). The photograph was not adequate for the purpose for which it was being offered: to show whether the driver could be seen at night by occupants of the Mustang as they turned left. *See* 5 K. Tegland, Wash. Prac., *Evidence* § 95 (1989).

■ The court's remark that no camera can approximate a human eye did not reveal the court's opinion of Mr. Burnam's own observations or the merits of the case. Mr. Burnam was permitted to testify that he, personally, was not able to distinguish a face through the windshield. The remark was not a comment on the evidence. *See State v. Lord*, 117 Wn.2d 829, 863, 822 P.2d 177 (1991), *cert. denied*, ___ U.S. ___, 121 L. Ed. 2d 112, 113 S. Ct. 164 (1992); *State v. Swan*, 114 Wn.2d 613, 657, 790 P.2d 610 (1990), *cert. denied*, 498 U.S. 1046, 112 L. Ed. 2d 772, 111 S. Ct. 752 (1991).

■ B. New evidence. Mr. Salamanca contends the court should have granted his motion for a new trial because the eyewitness testimony of Ms. Ortiz's brothers meets the criteria of *State v. Williams*, 96 Wn.2d 215, 222-23, 634 P.2d 868 (1981): the evidence (1) would probably change the result of the trial; (2) was discovered since the trial; (3) could not have been discovered before trial by the exercise of due diligence; (4) is material; and (5) is not merely cumulative or impeaching.

The absence of just one of the five criteria justifies refusal of a motion for new trial. *Williams*, at 223. The trial court's ruling will not be disturbed unless the appellant shows a manifest abuse of discretion. *State v. Letellier*, 16 Wn. App. 695, 700, 558 P.2d 838 (1977). Mr. Salamanca has not done so.

First, as the trial court noted, had the evidence actually existed it must have been known by Ms. Ortiz and Mr. Salamanca. Due diligence could have produced it before trial. Second, and more importantly, there is no reason to believe the two boys' testimony as summarized in Mr. Burnam's affidavit would have changed the outcome of the trial. *See State v. Hutcheson*, 62 Wn. App. 282, 296-300, 813 P.2d 1283 (1991), *review denied*, 118 Wn.2d 1020 (1992). The new testimony contradicts Ms. Arrellano's testimony that her brother Rigoberto was with Mr. Salamanca while he was making the telephone call that provided his alibi. It also potentially contradicts Mr. Salamanca's contention the driver of the El

Camino could not be seen through its tinted windows. Finally, as the court recognized, even if the new testimony as represented in the affidavit were true, it does not preclude Mr. Salamanca's involvement in the shooting.

## II
### SUFFICIENCY OF THE EVIDENCE
### OF FIRST DEGREE ASSAULT

Mr. Salamanca contends four of the first degree assault convictions resulted because the jury was improperly permitted to rely on transferred intent.[2] He asserts the doctrine of transferred intent is inconsistent with this State's assault statutes. He argues it cannot be used in a first degree assault case because it relieves the State of its burden of proving specific intent to seriously injure a specific individual, citing RCW 9A.36.011(1)(a) and *State v. Louther*, 22 Wn.2d 497, 502, 156 P.2d 672 (1945). He further argues the evidence only supports a conclusion that Mr. Salamanca or the shooter intended to harm Charles Tatum, and that there was no evidence from which the jury could conclude Mr. Salamanca or the shooter intended to inflict harm on any of the other occupants of the vehicle. He is mistaken.

The common law doctrine of transferred intent, recognized and applied in *State v. McGonigle*, 14 Wash. 594, 601-02, 45 P. 20 (1896), is not necessarily inconsistent with this State's later-developed assault statutes. The court considered the issue in *State v. Cogswell*, 54 Wn.2d 240, 244-46, 339 P.2d 465 (1959), but left the question open.

In *Cogswell*, Mrs. Cogswell and her daughter occupied twin beds placed next to each other in a bedroom. Mr. Cogswell entered the bedroom, Mrs. Cogswell grabbed her daughter,

---

[2] The court's instruction 9, to which no exception was taken at trial, states:
"If a person assaults a particular individual or group of individuals with a firearm with intent to inflict great bodily harm and by mistake, inadvertence or indifference, the assault with the firearm took effect upon an unintended individual or individuals, the law holds that the intent to inflict great bodily harm with the firearm is transferred to the unintended individual or individuals as well."

Mr. Cogswell fired a revolver, the shot passed through Mrs. Cogswell and struck the child. Mr. Cogswell, convicted of first degree assault against both his wife and his daughter, assigned error to an instruction on transferred intent, worded similarly to that in the present case. He argued the instruction was erroneous because, in the absence of a statute, the doctrine is not applicable to specific intent crimes.

The court noted other jurisdictions were divided as to whether a conviction of assault with intent to kill may rest upon proof of intent against any person generally, or whether it must be against the person assaulted. The court also noted the issue was one of first impression in this state, but concluded it need not be resolved on the facts of the Cogswell incident. There was evidence from which it could be inferred Mr. Cogswell intended to kill both his wife and his daughter. *Cogswell*, at 244-45. As for the instruction on transferred intent, the court held

> Instruction No. 15 may be superfluous, but we do not believe it was prejudicial error *under the facts of the instant case*, for the jury could have found there was "intent to kill . . . the second individual" be it by transfer of intent or not.

*Cogswell*, at 246.

In this case, too, there is evidence from which the jury could infer Mr. Salamanca (and the shooter) intended to inflict great bodily harm on all of the Mustang occupants. Mr. Salamanca did not just drive his companion to a location where a shot or shots could be fired at Mr. Tatum. He pursued the Mustang over considerable distance, at high speeds, for a considerable length of time. Mr. Salamanca kept the Mustang in close range while the shooter fired a series of shots at the vehicle, apparently took time to reload, then fired another series of shots. The occupants of the Mustang were at risk of death or serious injury not only from the gunfire, but also from a traffic accident if bullets hit the tires, gas tank or driver (as some, in fact, did). Under *Louther*, specific intent cannot be presumed. However, it can be inferred as a logical probability from the evidence. *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980).

Here, as in *Cogswell*, the instruction on transferred intent may have been superfluous, but it was not prejudicial error under the circumstances. This is particularly true considering the nature of Mr. Salamanca's defense. It was his presence that was hotly contested, not his intent.

### III
### CONSECUTIVE OR CONCURRENT SENTENCES

RCW 9.94A.400(1)(b) provides for mandatory consecutive sentences

> [w]henever a person is convicted of two or more serious violent offenses, as defined in RCW 9.94A.030, arising from separate and distinct criminal conduct . . ..

Mr. Salamanca contends resentencing is necessary because the separate convictions did not arise from separate and distinct criminal conduct as that term is used in RCW 9.94A.400(1)(b). He argues that discharging the firearm into the car was a single act which created as many victims as there were persons in the car, but the crimes involved the same objective criminal intent and each crime furthered the others. He concludes, therefore, that he had a right to concurrent sentences, citing *State v. Collicott*, 118 Wn.2d 649, 827 P.2d 263 (1992) (*Collicott* II); *State v. Lessley*, 118 Wn.2d 773, 827 P.2d 996 (1992); *State v. Collicott*, 112 Wn.2d 399, 409, 771 P.2d 1137 (1989) (*Collicott* I); *State v. Dunaway*, 109 Wn.2d 207, 217, 743 P.2d 1237, 749 P.2d 160 (1987).[3] Again, he is mistaken.

Under RCW 9.94A.400(1)(b), prior convictions and other current convictions that are not violent offenses are used to calculate the offender score and sentence range for

---

[3]At issue in the cases cited by Mr. Salamanca is RCW 9.94A.400(1)(a), which governs determination of the offender score and provides that current offenses encompassing the same criminal conduct shall be counted as one crime. The cases do not control interpretation of the different language found in RCW 9.94A.400(1)(b). In any case, they do not support Mr. Salamanca's position. *Lessley* and *Collicott* II both reaffirm the emphasis in *Dunaway* on separate treatment of crimes involving multiple victims. "Same criminal conduct" is statutorily and judicially defined to exclude multiple victims. RCW 9.94A-.400(1)(a); *Lessley*, at 777; *Collicott* II; *Dunaway*.

only one of the serious violent offenses, while the sentence ranges for the other serious violent offenses are calculated by using an offender score of 0. Thus, the sentence ranges of the extra serious violent offenses are shorter than would ordinarily be the case, but the term of incarceration is longer because the sentences are served consecutively instead of concurrently. This scheme avoids double counting of convictions while ensuring increased punishment for multiple violent offenses, a clearly intended result which is consistent with the purposes of the Sentencing Reform Act of 1981. D. Boerner, *Sentencing in Washington* §§ 5.8(b), 6.20 (1985).

The assaults in this case arise from separate and distinct conduct because they involve separate and distinct victims. *See State v. Godwin*, 57 Wn. App. 760, 763-64, 790 P.2d 641, *review denied*, 115 Wn.2d 1006 (1990); D. Boerner. *See also State v. Hicks*, 61 Wn. App. 923, 931, 812 P.2d 893 (1991); *State v. Clinton*, 48 Wn. App. 671, 674, 741 P.2d 52 (1987).

We affirm Mr. Salamanca's convictions and sentences.

THOMPSON and SWEENEY, JJ., concur.

Review denied at 122 Wn.2d 1020 (1993).