**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| STATE OF WASHINGTON, | No. 86169-7-I |
| Respondent, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| JOHN PATRICK KELLY, | |
| Appellant. | |

FELDMAN, J. — We are asked in this appeal to decide (among other issues) whether the common law doctrine of transferred intent applies in cases, like this one, where the defendant is charged with second degree assault. John Patrick Kelly pointed a loaded handgun at Alexander and Jessica Cope and their three children and yelled "Call 911 or I'll shoot you" as they walked past his residence. Although Kelly told police after the incident that he saw only Mr. Cope and not Ms. Cope when he yelled "I'll shoot you," he was convicted and sentenced for second degree assault against Ms. Cope in addition to second degree assault against Mr. Cope and the lesser included offense of unlawful display of a weapon against the eldest Cope child. The trial court sentenced Kelly within the standard range on each count and imposed two 36-month firearm enhancements to run consecutively for a total sentence of 7 years of confinement. On appeal, Kelly argues (a) in the absence of transferred intent, which he claims is inapplicable here, there is

insufficient evidence to sustain the conviction on second degree assault against Ms. Cope, (b) his convictions also should be reversed because of prosecutorial misconduct, and (c) the trial court erred in running the firearm enhancements consecutively. We affirm.

I

Alexander Cope, Jessica Cope, and their three minor children were walking through their neighborhood when they heard a banging sound from a nearby house. Mr. and Ms. Cope looked toward the house and saw Kelly leaning out of a second-story story window waving a silver object. Kelly yelled at the Copes, "Does this look like a fake to you?" Mr. Cope realized the object in Kelly's hand was a handgun and replied, "What are you talking about?" Kelly then pointed the handgun at the Cope family and said, "Call 911. Somebody is out to get me. Call 911 or I'll shoot you." At this point, Ms. Cope also realized the object was a handgun. Mr. and Ms. Cope were standing one to two feet away from each other when Kelly pointed the gun at them. Recognizing Kelly's statements as a threat and fearing that Kelly would shoot them and their children, Mr. and Ms. Cope quickly walked their children around the corner out of Kelly's view and reported the incident to law enforcement.

When police arrived at Kelly's residence, Kelly initially refused to engage with them because he believed they were not real law enforcement officers. When Kelly eventually talked to the officers, he said a man named Nick had been trying to kill him as part of a conspiracy. Over the previous two days, Kelly had called 911 several times to report his concerns to law enforcement, but Kelly believed that Nick had rerouted these phone calls to fake law enforcement officers. Kelly

had also spray painted "Call 911" on his window. When police asked him if he had interacted with anyone outside of his residence, Kelly said he tried to wave down a man walking by his house to call 911 but became upset when the man refused. Kelly denied pointing a firearm at the man or seeing a family walking with him. Officers believed Kelly's paranoid and erratic behavior was caused by his admitted methamphetamine use over the past several days. Upon searching the upstairs bedroom, officers discovered a loaded silver semi-automatic handgun with a round in the chamber and the safety off.

The State initially charged Kelly with five counts of first degree assault, but it reduced the charges before trial to second degree assault, each with an individual firearm enhancement. After the State rested at trial, the court dismissed two of the assault charges relating to the youngest Cope children for insufficient evidence because "they were too young to know what was happening." The jury convicted Kelly on the remaining charges of (1) second degree assault against Mr. Cope, (2) second degree assault against Ms. Cope, and (3) the lesser included offense of unlawful display of a weapon against the eldest Cope child. The jury also found by special verdict that Kelly was armed with a firearm during the commission of the crimes. The trial court sentenced Kelly to 12 months of confinement on the underlying charges and imposed two 36-month firearm enhancements to run consecutively for a total sentence of 7 years of confinement. Kelly appeals.

## II

### A.    Sufficiency of the evidence

Kelly asserts that the State "presented insufficient evidence to sustain a

conviction" of second degree assault against Ms. Cope. We disagree.

Kelly's argument is premised on the trial court's to-convict instruction, which he correctly argues is controlling under the law of the case doctrine. While the law of the case doctrine "means different things in different circumstances," here it is used to refer "to the principle that jury instructions that are not objected to are treated as the properly applicable law for purposes of appeal." *State v. Johnson*, 188 Wn.2d 742, 755, 399 P.3d 507 (2017) (quoting *Roberson v. Perez*, 156 Wn.2d 33, 41, 123 P.3d 844 (2005)). "In criminal cases, the State assumes the burden of proving otherwise unnecessary elements of the offense when such added elements are included without objection in the 'to convict' instruction." *Id.* at 756 (citing *State v. Hickman*, 135 Wn.2d 97, 102, 954 P.2d 900 (1998)). This legal principal is the central thrust of Kelly's argument.

The to-convict instruction at issue here (instruction 14) states:

> To convict the defendant of the crime of assault in the second degree, as charged in count two, each of the following elements of the crime must be proved beyond a reasonable doubt:
>
> (1) That on or about 20th day of May, 2020, the defendant assaulted Jessica Cope with a deadly weapon; and
>
> (2) That this act occurred in the State of Washington.
>
> If you find from the evidence that each of these elements have been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.
>
> On the other hand, if, after weighing all the evidence, you have a reasonable doubt as to any of these elements, then it will be your duty to return a verdict of not guilty.

Thus, to convict Kelly of second degree assault against Ms. Cope, the State was required to prove beyond a reasonable doubt that (1) Kelly "assaulted Jessica Cope," (2) he used a "deadly weapon," and (3) this act occurred in Washington.

When analyzing whether evidence is sufficient to uphold a jury's verdict, this court applies a deferential standard of review. *In re Pers. Restraint of Martinez*, 171 Wn.2d 354, 364, 256 P.3d 277 (2011). "Evidence is sufficient to support a conviction if, viewed in the light most favorable to the prosecution, it permits any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt." *State v. Andy*, 182 Wn.2d 294, 303, 340 P.3d 840 (2014) (quoting *State v. Thomas*, 150 Wn.2d 821, 874, 83 P.3d 970 (2004)). Additionally, "all reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant." *Johnson*, 188 Wn.2d at 762 (quoting *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992)). We also defer to the jury on issues of conflicting testimony, witness credibility, and persuasiveness of the evidence. *Thomas*, 150 Wn.2d at 874-75.

Here, sufficient evidence shows that Kelly used a deadly weapon and that the assault took place in Washington. As noted previously, the evidence shows that Kelly pointed a loaded handgun at Mr. and Ms. Cope and their children and yelled "Call 911 or I'll shoot you" as they walked past his residence. Kelly does not contest, nor could he, that a loaded handgun is a deadly weapon. *See* instruction 10 ("A firearm, whether loaded or unloaded, is a deadly weapon."). The evidence also shows that the assault occurred in University Place, which is located in Washington. Thus, the first two elements of second degree assault against Ms. Cope are supported by sufficient evidence.

Sufficient evidence also supports the remaining element, which is that Kelly "assaulted Jessica Cope." Instruction 11 defines "assault" as follows:

An assault is . . . an act done with the intent to create in

another apprehension of fear of bodily injury, and which in fact creates in another a reasonable apprehension and imminent fear of bodily injury even though the actor did not actually intend to inflict bodily injury.

Instruction 11 requires intent, which is defined in two other jury instructions. First, instruction 9 states:

A person acts with intent or intentionally when acting with the objective or purpose to accomplish a result that constitutes a crime.

Second, instruction 12 states:

If a person acts with intent to assault another, but the act harms a third person, the actor is also deemed to have acted with intent to assault any third person who is put in reasonable apprehension and imminent fear of bodily injury.

Under these instructions, intent can be established by showing *either* (1) that Kelly intended to assault Ms. Cope (direct intent under instruction 9) *or* (2) that he intended to assault Mr. Cope and that Ms. Cope was put in reasonable apprehension and imminent fear of bodily injury (transferred intent under instruction 12).

Sufficient evidence supports a finding of transferred intent under Instruction 12. Kelly does not dispute that he acted with intent to assault Mr. Cope.[1] Under instruction 12, this intent transfers to Ms. Cope if she was put in reasonable apprehension and imminent fear of bodily injury. Addressing that issue, Ms. Cope testified that Kelly pointed the silver object in his hand "directly at us" and "[t]owards us. We were -- the wagon and the kids were next to me and next to my husband. We were all still standing together." When Kelly then said, "Call 911 or I'll shoot you," it became clear to Ms. Cope that the object "was indeed a firearm." Ms. Cope

---

[1] This concession is well taken because Mr. Cope testified he "believed we were going to be shot at" after Kelly pointed the handgun at him and his family and yelled "Call 911 or I'll shoot you."

6

quickly removed herself and her children from the line of fire because "I didn't want to be in any kind of vicinity to somebody waving a firearm in our direction. I was worried that it could be discharged." Viewed in the light most favorable to the State with all reasonable inferences drawn in the State's favor, there is sufficient evidence to establish transferred intent under instruction 12.

At oral argument, as well as in prior briefing, Kelly did not seriously dispute that there is sufficient evidence to find transferred intent under instruction 12. Instead, Kelly argues that the transferred intent doctrine does not apply to the second degree assault conviction at issue here. Stated another way, Kelly claims we should examine the sufficiency of the evidence *in the absence of* transferred intent and instruction 12. But contrary to Kelly's argument, Washington courts have recognized for decades that the transferred intent doctrine may apply in second degree assault cases. *See, e.g., State v. Aguilar*, 176 Wn. App. 264, 275, 308 P.3d 778 (2013) ("[T]ransferred intent is applicable to second degree assault charges involving an accidental or unintended victim.") (quoting *State v. Wilson*, 113 Wn. App. 122, 131, 52 P.3d 545 (2002)); *State v. Clinton*, 25 Wn. App. 400, 401, 606 P.2d 1240 (1980) (a "classic 'transferred intent' case" involving second degree assault where the defendant swung a pipe at one person but it slipped from his hand and struck another).

Nor are we persuaded by Kelly that the Washington legislature somehow abrogated the transferred intent doctrine in second degree assault cases when it codified the transferred intent doctrine in the first degree assault statute, RCW 9A.36.011, but *not* in the second degree assault statute, RCW 9A.36.021. In support of this argument, Kelly relies on *State v. Elmi*, 166 Wn.2d 209, 215, 207

7

P.3d 439 (2009), which involved a defendant who fired gunshots into a living room occupied by the targeted victim and four other children. 166 Wn.2d at 212-14. The Supreme Court affirmed Elmi's convictions for first degree assault against the four unintended victims under a strict reading of RCW 9A.36.011, which provides, "A person is guilty of assault in the first degree if he or she, with *intent to inflict* great bodily harm: . . . [a]ssaults *another* with a firearm . . . ." *Id.* at 218. Because the court determined that the first degree assault statute "encompasses transferred intent" by "provid[ing] that once the mens rea is established, any unintended victim is assaulted if they fall within the terms and conditions of the statute," the court did not resort to applying the common law transferred intent doctrine. *Id.*

In relying on *Elmi*, Kelly inverts the court's reasoning and erroneously concludes, without supporting authority, that "[b]ecause the legislature did not codify transferred intent, it could not be relied on to prove second-degree assault." Reply Br. 5.[2] But nowhere does *Elmi* state that the legislature abrogated the common law doctrine of transferred intent with respect to second degree assault by only codifying the doctrine into the first degree assault statute. To the contrary, *Elmi* implicitly rejected this argument by noting that the common law doctrine of transferred intent "is generally applied only when a criminal statute matches specific intent with a specific victim." *Elmi*, 166 Wn.2d at 217 (citing *State v.*

---

[2] This logical fallacy is referred to as "denying the antecedent," which former Justice Wiggins of our Supreme Court has explained as follows: "Under the rules of formal logic, conditional statements take the form, 'If P, then Q.' P is termed the antecedent and Q the consequent. The fallacy of denying the antecedent occurs when one takes a true statement presented in this form and concludes that 'if not P, then not Q' must also be true. That conclusion is not valid because negating the truth of the antecedent (i.e., denying the truth of P) does not necessitate the denial of its consequent." *State v. Brush*, 183 Wn.2d 550, 568 n.8, 353 P.3d 213 (2015) (Wiggins, J., concurring in part and concurring in result).

*Wilson*, 125 Wn.2d 212, 218, 883 P.2d 320 (1994)). The second degree assault statute does precisely this by stating that a person commits assault if he or she "[i]ntentionally assaults *another*." RCW 9A.36.021(1)(a) (emphasis added). Further, with respect to the crime of assault more generally, *Elmi* acknowledged that "assault does not, under all circumstances, require that the specific intent match a specific victim." *Elmi*, 166 Wn.2d at 216 (citing *Wilson*, 125 Wn.2d at 218)*.* For all these reasons, we reject Kelly's argument that the Washington legislature abrogated the transferred intent doctrine with respect to second degree assault.

Kelly's reliance on *State v. Abuan*, 161 Wn. App. 135, 257 P.3d 1 (2011), is likewise misplaced. In *Abuan*, the defendant was convicted of two counts of second degree assault after firing a gun at a person in a garage that was attached to a house where a second person heard the gunshots. *Id.* at 140-43. On appeal, the court concluded there was insufficient evidence of Abuan's intent to assault the person inside the house because (1) the State did not offer a transferred intent jury instruction and (2) there was an "absence of any injury or apprehension and imminent fear of bodily injury" because the person inside the house did not have a gun pointed at him, did not see the shooter or the gun, and could not see the shooting. *Id.* at 159. Unlike *Abuan*, here we have both a transferred intent jury instruction and ample evidence that Ms. Cope was placed in reasonable apprehension and imminent fear of bodily injury. On this record, *Abuan* is inapposite.

Next, Kelly contends that even if the transferred intent doctrine applies in *some* second degree assault cases, it does not apply in cases, like this one, where the conviction is premised on a reasonable apprehension and imminent fear of

bodily injury as opposed to physical harm. But Kelly fails to meaningfully distinguish between an assault where the defendant physically harms someone and one where the defendant only places someone in apprehension of harm. The *Elmi* court disavowed such a distinction: "The assault statute provides for the various methods of assault to be treated equally. As such, whether the unintended victim is actually battered (like in *Wilson*) or not (like in this case) is irrelevant for purposes of determining whether an assault occurred." *Elmi*, 166 Wn.2d at 217-18 (citing *Wilson*, 125 Wn.2d 212); *see also State v. Frasquillo*, 161 Wn. App. 907, 916, 255 P.3d 813 (2011) (noting that "under *Elmi*, transferred intent can also apply to victims who are only put in *apprehension* of harm").

Lastly, even if we were to agree with Kelly that the transferred intent doctrine does not apply to the second degree assault conviction at issue here, there is also sufficient evidence to establish the requisite intent to assault Ms. Cope in the absence of the transferred intent instruction. *See State v. Salamanca*, 69 Wn. App. 817, 826-27, 851 P.2d 1242 (1993) (finding sufficient evidence from which the jury could infer intent to assault another even if transferred intent instruction was "superfluous"). Although intent cannot be presumed, "it can be inferred as a logical probability from the evidence." *Id.* at 826. Ms. Cope testified that Kelly pointed the handgun toward her and her family and yelled "Call 911 or I'll shoot you"—a threat that applies equally to both Mr. and Ms. Cope.[3] And contrary to Kelly's subsequent statement to police that he saw only Mr. Cope and not Ms.

---

[3] *See, e.g.,* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2653 (1981) (defining "you" as "the one *or ones* being addressed") (emphasis added). On the record presented here, as described in the text above, a rational trier of fact could reasonably infer that "I'll shoot you" referred to both Mr. Cope or Ms. Cope together.

Cope when he yelled "I'll shoot you," Ms. Cope testified that she was standing just a couple feet away from Mr. Cope when Kelly pointed the gun at them. This evidence, viewed favorably to the State, supports a logical inference—and would allow a rational trier of fact to find—that Kelly intended to assault Ms. Cope. *See State v. Eastmond*, 129 Wn.2d 497, 500, 919 P.2d 577 (1996) ("jury may infer specific intent to create fear from the defendant's pointing a gun at the victim, unless the victim knew the weapon was unloaded"), effectively overruled on other grounds by *State v. Brown*, 147 Wn.2d 330, 340, 58 P.3d 889 (2002).

In short, with or without the transferred intent instruction, there is sufficient evidence to establish the elements of second degree assault against Ms. Cope.[4]

## B.    Prosecutorial misconduct

Kelly next argues the trial court erred in denying his motion for a new trial under CrR 7.5 based on three alleged instances of prosecutorial misconduct. We disagree.

Under CrR 7.5(a)(2), a trial court may grant a defendant's motion for a new trial based on prosecutorial misconduct "when it affirmatively appears that a substantial right of the defendant was materially affected." We review the denial of a CrR 7.5 motion for a new trial under an abuse of discretion standard. *State v. Davis*, 3 Wn. App. 2d 763, 787, 418 P.3d 199 (2018). Where, as here, the motion

---

[4] Additionally, the result also would be the same if we were to apply the statutory elements of second degree assault and corresponding common law. *See* RCW 9A.36.021(1)(c) ("A person is guilty of assault in the second degree if he or she, under circumstances not amounting to assault in the first degree . . . [a]ssaults another with a deadly weapon."); *Elmi*, 166 Wn.2d at 215 (specific intent is the "intent to produce a specific result, as opposed to intent to do the physical act that produces the result"); *Aguilar*, 176 Wn. App. at 275 ("Under the doctrine of transferred intent, once the intent to inflict harm on one victim is established, the mens rea transfers to any other victim who is actually assaulted."). We focus here on the jury instructions because, according to Kelly, when "the government proposed the instructions, they became the elements that the government needed to prove."

for a new trial is premised on prosecutorial misconduct, the defendant must prove the prosecutor's conduct was both improper and prejudicial. *State v. Sundberg*, 185 Wn.2d 147, 151-52, 370 P.3d 1 (2016). Additionally, if the defendant objected to the improper conduct at trial, the defendant must show the misconduct "resulted in prejudice that had a substantial likelihood of affecting the jury's verdict." *State v. Emery*, 174 Wn.2d 741, 760, 278 P.3d 653 (2012). If the defendant did not object, the defendant must show the misconduct was "so flagrant and ill intentioned" that "(1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.'" *Id.* at 760-61 (quoting *State v. Thorgerson*, 172 Wn.2d 438, 455, 258 P.3d 43 (2011)).

First, Kelly asserts the prosecutor committed misconduct by eliciting testimony in violation of a pretrial order that excluded on hearsay grounds a statement by one of the Cope children that he had "never seen a bad guy before." During trial, the prosecutor asked Ms. Cope, "When you say that everyone was shaken up, what did you see as far as, you know, how your husband was acting, how you were acting, how the children were acting?" Ms. Cope provided a lengthy answer ending with, "The things you say to kids that, you know, like . . . there's a bad guy. . . . the police will handle it." The trial court sustained defense counsel's objection to this answer and instructed the jury to disregard it.

Kelly fails to show that the prosecutor's conduct was improper. The reason that Ms. Cope eventually testified in violation of a pretrial order is not that the prosecutor asked an improper question, but rather that she provided a lengthy narrative response to a proper question. Additionally, the prosecutor warned Ms.

Cope before trial not to reference this excluded statement. Neither the trial court nor Kelly's trial counsel believed the prosecutor intentionally sought to elicit the prohibited "bad guy" statement from Ms. Cope. But even if the prosecutor's question was improper, the misconduct did not have a substantial likelihood of affecting the jury's verdict because the trial court sustained defense counsel's objection and instructed the jury to disregard the testimony, and we presume the jury followed this instruction. *See State v. Gauthier*, 189 Wn. App. 30, 39, 354 P.3d 900 (2015).

Second, Kelly alleges the prosecutor committed misconduct by attempting to shift the burden of proof. "A criminal defendant has no burden to present evidence, and it is error for the State to suggest otherwise." *State v. Montgomery*, 163 Wn.2d 577, 597, 183 P.3d 267 (2008). While a prosecutor can "point out a lack of evidentiary support for the defendant's theory of the case," a prosecutor may improperly shift the burden of proof by "mentioning during closing argument that the defense failed to present witnesses or by stating that the jury should find the defendant guilty based simply on the defendant's failure to present evidence to support his defense theory." *State v. Sells*, 166 Wn. App. 918, 930, 271 P.3d 952 (2012) (citing *State v. Jackson*, 150 Wn. App. 877, 885-86, 209 P.3d 553 (2009)).

During closing arguments in this case, defense counsel argued that Kelly did not form the requisite intent to assault the Copes because he was paranoid and delusional, but did not refer to Kelly's methamphetamine use. In response, the prosecutor argued during rebuttal closing argument, "Counsel talked about the fact that the defendant was delusional and paranoid. There was evidence of that.

13

But you have to ask yourself where was the expert to establish the level of methamphetamine?" The trial court again sustained defense counsel's objection based on improper burden shifting and instructed the jury to disregard the remark.

Here, the prosecutor's statement that the jury must "ask [itself] where was the expert to establish the level of methamphetamine" was improper burden shifting because it told the jury that Kelly had to present expert testimony to prove he could not develop the requisite mens rea to commit the charged offenses due to his drug use. The State referred to this hypothetical expert testimony for the first time during its rebuttal closing argument, which deprived Kelly of an opportunity to explain the absence of any expert testimony.[5] Our case law recognizes, "Defendants are among the people the prosecutor represents. The prosecutor owes a duty to defendants to see that their rights to a constitutionally fair trial are not violated." *State v. Monday*, 171 Wn.2d 667, 676, 257 P.3d 551 (2011). But while the prosecutor's statement was improper, it did not have a substantial likelihood of affecting the jury's verdict because the trial court sustained defense counsel's objection and instructed the jury to disregard the remark. *See Gauthier*, 189 Wn. App. at 39. The trial court did not abuse its discretion in denying Kelly's motion for a new trial based on this improper statement.

---

[5] The State's reliance on the "missing witness doctrine" set forth in *State v. Blair*, 117 Wn.2d 479, 816 P.2d 718 (1991), is misplaced. The missing witness doctrine permits the State to "point out the absence of a 'natural witness' when it appears reasonable that the witness is under the defendant's control or peculiarly available to the defendant and the defendant would not have failed to produce the witness unless the testimony were unfavorable." *Montgomery*, 163 Wn.2d at 598 (citing *Blair*, 117 Wn.2d at 485-86). *Blair* is inapposite because it involved a defendant's failure to call a fact witness that the defendant claimed would support their theory of the case, not a hypothetical expert witness the State asserted the defendant should have called. The State has not cited any authority extending the missing witness doctrine to a case, like Kelly's, where there is no evidence in the record that the defendant retained an expert who would have testified unfavorably for the defendant.

Third, Kelly avers that the prosecutor improperly denigrated the dignity of defense counsel through audible sighs and non-verbal gestures. The record indicates that one such audible sigh occurred during the following interaction outside the presence of the jury after the prosecutor argued that certain statements were inadmissible hearsay:

> MR. AUSSERER [Defense]: Well, it's not hearsay. I—Your Honor, I would appreciate if we could refrain from—
>
> THE COURT: Again, we get back to what we discussed yesterday. And, you know, I know that this—there's high emotions here. But we are—you know, this is significant and very serious for everybody here, and we need to—Ms. Hauger, if you could refrain from the sighing—the audible sighs. That would be—
>
> MS. HAUGER [Prosecutor]: I apologize. It's just that I know Mr. Ausserer. I know him to be a very competent attorney, and he knows what hearsay is.
>
> THE COURT: All right.
>
> MS. HAUGER: And I apologize. I will refrain.
>
> THE COURT: Thank you[6]

According to Kelly's post-trial motion for a new trial, jurors indicated after trial that they "observ[ed] audible responses and obvious emoting [from the prosecutor] in response to each issue raised during cross examination of all witnesses," such as eye-rolling, audible sighs, and "physically react[ing] in a negative manner during the defendant's examination."

If these allegations are correct, then the prosecutor's conduct was improper because it impugned the role or integrity of defense counsel and expressed a

---

[6] The trial court's reference to "what we discussed yesterday" likely relates to its prior statement to both counsel that "you're both professionals, and I expect both of you to behave that way. I don't want to be a referee."

personal opinion as to the credibility of a witness or the defendant's guilt. *State v. Lindsay*, 180 Wn.2d at 431-32, 437, 326 P.3d 125 (2014). This, too, violates the prosecutor's "duty to defendants to see that their rights to a constitutionally fair trial are not violated." *Monday*, 171 Wn.2d at 676. But the audible sigh that is recounted above—which is the primary focus of Kelly's appellate argument— occurred outside the presence of the jury, thereby obviating any prejudicial effect it may have had on the verdict. And while jurors indicated that such improper conduct occurred throughout the trial, Kelly did not object and, thus, must show the conduct was so flagrant and ill intentioned that no curative instruction could have cured any prejudice. *Emery*, 174 Wn.2d at 760-61. Because Kelly fails to show, as he must, that a curative instruction would not have cured any prejudice from the prosecutor's improper conduct, his third and final argument also fails.[7]

## C.    Firearm enhancements

Finally, Kelly contends that remand is necessary because the sentencing court did not know it had discretion to run the firearm enhancements concurrently under RCW 9.94A.535, which permits a court to impose an exceptional sentence below the standard sentence range if "substantial and compelling reasons justify[] an exceptional sentence." A defendant may seek appellate review from a discretionary sentence within the standard range in "circumstances where the

---

[7] The trial court likewise concluded that the prosecutor's sighs and other nonverbal conduct did not affect the jury's verdict because "the fact that [the jurors] may have noted [the prosecutor's] behavior and yet rendered the verdict that they did would indicate to the Court that that was not what they were looking at in making their determination." While we have carefully scrutinized Kelly's argument on this point, the applicable standard of review is abuse of discretion and we may properly defer to the trial court's ruling on this point. *See State v. Stenson*, 132 Wn.2d 668, 719, 940 P.2d 1239 (1997) ("The trial court is in the best position to most effectively determine if prosecutorial misconduct prejudiced a defendant's right to a fair trial.") (quoting *State v. Luvene*, 127 Wn.2d 690, 701, 903 P.2d 960 (1995)).

court has refused to exercise discretion at all or has relied on an impermissible basis for refusing to impose an exceptional sentence below the standard range." *State v. Mandefero*, 14 Wn. App. 2d 825, 833, 473 P.3d 1239 (2020) (quoting *State v. McFarland*, 189 Wn.2d 47, 56, 399 P.3d 1106 (2017)). Because our Supreme Court has squarely held that a sentencing court has no discretion to depart from mandatory weapon enhancements, we reject Kelly's argument.

In *State v. Brown*, our Supreme Court held that "judicial discretion to impose an exceptional sentence does not extend to a deadly weapon enhancement." 139 Wn.2d 20, 29, 983 P.2d 608 (1999), *overruled on other grounds by State v. Houston-Sconiers*, 188 Wn.2d 1, 21 n.5, 391 P.3d 409 (2017). After adding a twelve-month deadly weapon enhancement to the defendant's sentence pursuant to former RCW 9.94A.310(4)(b), the sentencing court in *Brown* granted the jury's request for leniency and imposed an exceptional sentence downward of seven months on the defendant's second degree assault conviction. 139 Wn.2d at 23, 29. On appeal, the Supreme Court remanded for resentencing because the length of the sentence was shorter than the enhancement range. *Id.* The court relied on the "absolute" language of the firearm enhancement statute stating, "*Notwithstanding any other provision of law*, any and all deadly weapon enhancements under this section are *mandatory, shall be served in total confinement*, and shall not run concurrently with any other sentencing provisions." *Id.* at 26 (quoting former RCW 9.94A.310(4)(e)).

As the Supreme Court held in *Brown* and the plain language of the applicable sentencing statutes confirms, a sentencing court does not have discretion to impose an exceptional sentence downward by running firearm

enhancements concurrently instead of consecutively. The current version of the firearm enhancement statute mirrors the statute in *Brown* by stating, "Notwithstanding any other provision of law, all firearm enhancements under this section are mandatory, shall be served in total confinement, and *shall run consecutively to all other sentencing provisions, including other firearm or deadly weapon enhancements*." RCW 9.94A.533(e) (emphasis added). Thus, the sentencing court correctly concluded it had no discretion to run the firearm enhancements concurrently as part of an exceptional sentence.

Kelly argues that *Brown* is no longer controlling on this issue following the Supreme Court's recent decision in *Houston-Sconiers*, 188 Wn.2d at 21 n.5. This argument is unconvincing because *Houston-Sconiers* overruled *Brown* only to the extent its holding applied to juvenile sentencing. The court held as follows:

> [S]entencing courts must have complete discretion to consider mitigating circumstances *associated with the youth of any juvenile defendant*, even in the adult criminal justice system, regardless of whether the juvenile is there following a decline hearing or not. To the extent our state statutes have been interpreted to bar such discretion *with regard to juveniles*, they are overruled. Trial courts must consider mitigating qualities *of youth at sentencing* and must have discretion to impose any sentence below the otherwise applicable [statutory] range and/or sentence enhancements.

*Id.* (citing *Brown*, 139 Wn.2d at 29) (emphasis added). As Kelly acknowledges, our court has issued multiple opinions holding that *Brown* is and remains good law with respect to adult sentencing and that a sentencing court must run firearm

18

enhancements consecutively when sentencing adults.[8]   Consistent with this controlling precedent, we affirm Kelly's sentence.

Affirmed.

_Feldman, J._

WE CONCUR:

_Hazelrigg, ACJ_               _Mann, J._

---

[8] *See Mandefero*, 14 Wn. App. 2d at 830-32 ("*Houston-Sconiers* overrules *Brown* only as it applies to juveniles"); *State v. Brown*, 13 Wn. App. 2d 288, 291, 466 P.3d 244 (2020) ("*Houston-Sconiers* overruled *Brown* with regard to juveniles only"). Division Three of the Court of Appeals has reached the same conclusion. *State v. Wright*, 19 Wn. App. 2d 37, 52, 493 P.3d 1220 (2021) ("*Brown* remains good law as applied to adult offenders"). Similarly, Kelly's argument that we should rely on Justice Madsen's concurring opinion in *Houston-Sconiers* stating that a trial court has "discretion to depart from the otherwise mandatory sentencing enhancements when the court is imposing an exceptional sentence," 188 Wn.2d at 34, has also been squarely rejected by our court. *See Brown*, 13 Wn. App. 2d at 291 (our court "does not have the authority to overrule *Brown*" because "a decision by the Washington Supreme Court is binding on all lower courts of the state").